**McDONNELL DOUGLAS CORPORA-TION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 71–1720.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1972.

Decided Jan. 26, 1973.

Veryl L. Riddle, St. Louis, Mo., for petitioner.

Jay E. Shanklin, Atty. N. L. R. B., Washington, D. C., for respondent.

Before MATTHES, Chief Judge, MEHAFFY, Circuit Judge, and VAN PELT, Senior District Judge.*

MATTHES, Chief Judge.

This case presents the petition of McDonnell Douglas Corp.[1] to review and set aside the order of the National Labor Relations Board which found McDonnell had committed unfair labor practices. The Board has cross-applied for enforcement of the order. The Board's decision and order, issued on December 14, 1971, is reported at 194 N.L.R.B. No. 75, 78 LRRM 1705. The main issue presented by the contested

---

* District of Nebraska, sitting by designation.

1. Hereinafter referred to as McDonnell or petitioner.

order is the validity of McDonnell's rule limiting solicitation and distribution on company property by off-duty employees.

## I.  BACKGROUND

This controversy is limited to McDonnell's production facility located adjacent to Lambert St. Louis International Airport in St. Louis, Missouri. The pertinent facts relevant to the physical facilities and the operations of McDonnell are fairly reflected in Board member Kennedy's dissenting opinion. For the purposes of this opinion and in order to properly understand the genesis of the no-solicitation, no-distribution rule, the following discussion of the facts will suffice. At the St. Louis plant there are several buildings which occupy 500 acres. There are 31,000 employees engaged in the manufacture of all types of aircraft, including but not limited to missiles, space vehicles and military airplanes. Of primary importance here is that much of this production is militarily sensitive and thus is classified by the United States government in varying degrees of secrecy.

In order to protect these national security interests, as well as its own proprietary interests in its plant and its nonsecret production, McDonnell employs a somewhat elaborate security system. The St. Louis facility is encircled by two barriers, known as the outer and inner perimeters respectively, and within the inner perimeter the high security areas are further cordoned off and guarded with admission limited to those with proper clearance. The outer perimeter consists of a seven-foot, chain link fence topped with barbed wire. The inner perimeter is composed largely of the same type fencing, but in some places consists of the outer walls of buildings. Between the two perimeters are parking lots adequate to accommo-

date 18,000 cars. During the day, the gates of the outer perimeter leading to the parking lots are open and unguarded, whereas the inner perimeter gates are guarded and admission is conditioned upon presentation of a computer-punch badge bearing one's picture and insertion of the badge into the proper machinery to verify its validity. At night, however, only one gate through the outer perimeter is open and it is guarded. Similarly, the security force is deployed on a ratio of one guard per 300 employees and thus is drastically decreased at night since there are 25,000 employees on the day shift but only 5,000 on the second shift and 1,000 on the third shift.

Also important to note is the presence within McDonnell's plant of a substantial amount of non-working space. In addition to the many restrooms, smoking and vending areas, etc., which accompany so large a work-force, McDonnell operates seven cafeterias for its employees. Since these cafeterias are open for breakfast, McDonnell opens its parking lots one and one-half or more hours before the morning shifts are commenced —the starting and quitting times of the morning shifts being staggered to facilitate traffic flow.

## II.  PROCEDURAL HISTORY

This case was generated by an incident which occurred on September 17, 1970. On that day, Boyd Masterson, Vice-President of Technical Employees of Aerospace Manufacturers [TEAM], the perennial insurgent union at McDonnell's St. Louis plant, attempted to distribute TEAM literature on one of the parking lots a few minutes prior to his shift. A plant guard, erroneously believing this conduct violated McDonnell's distribution rule, forced Masterson to cease distributing the leaflets.[2]

2. There is evidence to the effect that a no-distribution, no-solicitation rule had been in effect approximately 14 years. However, the record is not clear as to whether the rule had been reduced to writing and posted, or whether the policy or rule against solicitation resulted from the practice of McDonnell in controlling solicitation and distribution.

Warren Flynn, McDonnell's manager of labor relations, learned of this incident. Shortly thereafter, Flynn and Ivan Rutherford, McDonnell's Director of Security, promulgated the subject rule, and on September 21, 1970 Flynn circulated among the guard force the memorandum detailing McDonnell's rule. The rule as stated in this memorandum —which would in fact permit the activity in which Masterson had engaged— provides in pertinent part:

"DISTRIBUTION OF LITERATURE

### By Employes

Employes are permitted to distribute literature only in *non-work* areas (parking lots, plant entrances, exits, and cafeterias) and only during *non-working* time (during lunch or break periods and for a reasonable time before or after their shifts). They may not distribute literature in *work* areas (places of actual work) at any time. Nor may they distribute literature *anywhere* during their *working* time.

### By Non-Employes *

Non-employes are not allowed to distribute literature *anywhere* on Company premises at *any* time.

### Type of Literature

The only sort of literature which may be distributed is literature on behalf of any labor organization or in opposition to any labor organization and which contains nothing scurrilous, reckless, libelous, defamatory, or provocative nor any inflammatory appeals to racism or the like.

### SOLICITATION

### By Employes

Employes are permitted to engage in word of mouth solicitation (for membership, signatures, etc.), either in or outside their work areas, so long as this is done during *non-working* time.

### By Non-Employes *

Non-employes are not allowed to engage in solicitation *anywhere* on company premises at *any* time.

* NOTE: Employes are not allowed on company premises except during their scheduled working hours and a reasonable period before and after those hours. At other times, they are to be treated as non-employes."

Appendix pp. 15–16 (emphasis original).

As a reading of the rule will indicate, it conforms with the Board's settled doctrine, discussed *infra*, insofar as it allows on-duty employees to distribute literature in non-work areas and times and to engage in oral solicitation during non-work time. The portion of the rule contested by the General Counsel, and ultimately voided by the Board, was that which allows solicitation and distribution by off-duty employees only during a "reasonable time" before and after their shift and otherwise classifies them as non-employees who are barred from the company premises and thus from soliciting and distributing thereon.

The posting of the rule precipitated the filing of the complaint by the General Counsel on December 1, 1970. Briefly, the complaint alleged a violation of § 8(a)(1) both in the Masterson Incident and in the promulgation of that part of the rule discussed in the preceding paragraph. McDonnell defended on the ground that the Masterson Incident was an isolated, remedied, and therefore de minimis occurrence and that the contested portion of the no-distribution, no-solicitation rule is necessitated by McDonnell's size and security considerations.

The trial examiner found against McDonnell and recommended an order so broad in scope that the majority of the three-member panel declined to adopt it, stating that it might be interpreted to preclude adoption and promulgation of reasonable rules designed to implement McDonnell's legitimate concerns. However, the Board adopted the examiner's findings of unfair practices and, by a

divided vote, issued a remedial order which required McDonnell to:

"1. Cease and desist, except as Respondent can establish it is necessary to maintain production, discipline, or security, from:

(a) Interfering with the rights of its employees to distribute literature on behalf of Technical Employees of Aerospace Manufacturers, or any other labor organization, *on its parking lots during nonworking time.*

(b) Promulgating, maintaining, and giving effect to any rules which limit its employees' rights to *distribute literature on its premises during nonworking time in nonwork areas,* or to engage in union solicitation on its premises during nonworking time unless the limitations imposed on such activity can be justified by Respondent as necessary to maintain production, discipline, or security.

\*    \*    \*    \*    \*    \*

2. Take the following affirmative action which is deemed necessary to effectuate the policies of the Act:

(a) Revoke and withdraw its existing no-distribution and no-solicitation rules to the extent that they purport to classify employees as nonemployees for the purpose of applying and enforcing such rules, or infringe upon employee rights with respect to union solicitation or distribution of union literature to any greater extent than Respondent can establish is required in order to maintain production, discipline, or security."

Appendix p. 56 (emphasis supplied).

We read this order as compelling recission of parts of McDonnell's rule with the result that, unless McDonnell can at some unnamed time and place establish the necessity of doing so, McDonnell can no longer bar off-duty employees (1) from soliciting or distributing *anytime* in the parking lots and the other nonwork areas of the plant or (2) from soliciting on-duty employees *anywhere* during the on-duty employees' non-work time. The rationale of this order is that the rule's "reasonable time" standard is too vague and because McDonnell "had not established sufficient justification for" the rule and it is therefore "unnecessarily destructive of employee rights."

This decision and order, however, were not adopted without dissent. Member Kennedy agreed that McDonnell had violated § 8(a)(1) because of the Masterson Incident. However, he dissented vigorously from his colleagues' conclusion that the no-distribution and no-solicitation rule interferes with employee rights in violation of § 8(a)(1). He reasoned:

"In finding a violation, by colleagues have concluded that (1) Respondent has not established sufficient justification for limiting the right of its employees to distribute union literature and engage in union solicitation and (2) Respondent's announced rule is 'unnecessarily destructive of employee rights because it is so vague that employees cannot know what they may and may not do, and because the rule can be and has once been interpreted so as virtually to preclude the exercise of established employee rights.' The reference of my colleagues to a prior interpretation of the rule is undoubtedly to the Masterson Incident. In my opinion, the findings and conclusions of my colleagues in this regard are based on a faulty and incomplete view of the controlling facts and are erroneous."

78 LRRM at 1707.

After further discussion of the majority's opinion and order member Kennedy stated:

"As is plain from the foregoing, my colleagues, in condemning Respondent's rule on the ground that it is 'so vague' and undefined 'that employees cannot know what they may and may not do', have committed the very sin they purport to correct by framing their order in the 'vague' terms of

'published rules justified by considerations of production, discipline, or security' for they fail to indicate what would constitute justification for such rules or why Respondent's concern with such matters as security, traffic, and littering reflected by its present rule is not 'justified.' Nor do my colleagues indicate when, to whom, and in what manner Respondent 'can establish' that its rules are justified."

*Id.*

From this divided opinion and order, McDonnell brings this proceeding.

## III. THE MERITS

Subsequent to the Supreme Court's approval in Republic Aviation Corp. v. NLRB and NLRB v. LeTourneau Company of Georgia, decided in one opinion reported at 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), the Board has consistently maintained the policy that employers' rules limiting solicitation in non-work time, and distribution in non-work time and areas, are presumptively invalid, and that the burden is on the employer to show special circumstances justifying the rule. *See, e. g.,* Stoddard-Quirk Mfg. Co., 138 NLRB 615 (1962). In applying that policy to the present case, the Board presumed the controverted portion of McDonnell's rule to be invalid and then considered McDonnell's evidence of its security problems to be insufficient justification for denying all off-duty employees access to any company property for distribution or solicitation.

McDonnell contends the decision and order is erroneous because it gives too little weight to McDonnell's security problems and because the Board, in weighing the justifying evidence, failed to consider as part of the equation the fact that McDonnell's rule leaves open to its employees the customary avenues of communication, to wit: during breaks and on the parking lots during the changing of the particular workers' shifts. We are in general agreement with McDonnell's position and for rea-

sons more fully stated below, we decline to enforce the Board's order and we remand the cause to the Board for further consideration.

All the apposite Supreme Court cases counsel that in deciding the validity vel non of a no-solicitation, no-distribution rule the Board must balance the interests of the employer and the employees. *Republic* and *LeTourneau, supra,* admonish that the Board must work

"out an adjustment between the undisputed right of self-organization assured to employees . . . and the equally undisputed right of employers to maintain discipline in their establishments. Like so many others, these rights are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee. Opportunity to organize and proper discipline are both essential elements in a balanced society."

324 U.S. at 797–798, 65 S.Ct. at 985.

Similarly in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), the Supreme Court reaffirmed the balancing test. While the primary question in that case dealt with non-employee union organizers rather than employees, and while the court said the distinction between the two "is one of substance," 351 U.S. at 113, 76 S.Ct. 679, the court emphasized that in determining the validity of the solicitation-distribution rule "organization rights" and "property rights" must be balanced.

In NLRB v. United Steelworkers of America, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958), the no-solicitation, no-distribution rule was concededly valid. The question for decision was whether the employer could enforce the rule against employees when it engaged in anti-union solicitation and committed other actions which constituted unfair labor practices. However, Mr. Justice Frankfurter wrote a comprehensive explication of the considerations which enter into the balancing process by which

the validity of a no-solicitation rule is determined. He said:

"No attempt was made in either of these cases to make a showing that the no-solicitation rules truly diminished the ability of the labor organizations involved to carry their messages to the employees. Just as that is a vital consideration in determining the validity of a no-solicitation rule, see Republic Aviation Corp. v. Labor Board, *supra*, [324 U.S.] at 797–798, [65 S.Ct. at pages 985–986]; Labor Board v. Babcock & Wilcox Co., *supra*, [351 U.S.] at 112, [76 S.Ct. at page 684], it is highly relevant in determining whether a valid rule has been fairly applied. Of course the rules had the effect of closing off one channel of communication; but the Taft-Hartley Act does not command that labor organizations as a matter of abstract law, under all circumstances, be protected in the use of every possible means of reaching the minds of individual workers, nor that they are entitled to use a medium of communication simply because the employer is using it. *Cf.* Bonwit Teller, Inc. v. Labor Board, [2 Cir.] 197 F.2d 640, 646; Labor Board v. F. W. Woolworth Co., [6 Cir.] 214 F.2d 78, 84 (concurring opinion). *No such mechanical answers will avail for the solution of this non-mechanical, complex problem in labor-management relations.* If, by virtue of the location of the plant and of the facilities and resources available to the union, the opportunities for effectively reaching the employees with a pro-union message, in spite of a no-solicitation rule, are at least as great as the employer's ability to promote the legally authorized expression of his anti-union views, there is no basis for invalidating these 'otherwise valid' rules. The Board, in determining whether or not the enforcement of such a rule in the circumstances of an individual case is an unfair labor practice, *may find relevant alternative channels available* for communications on the right to organize. When this

important issue is not even raised before the Board and no evidence bearing on it adduced, the concrete basis for appraising the significance of the employer's conduct is wanting."

357 U.S. at 363–364, 78 S.Ct. at 1272 (emphasis supplied).

■ Thus our analysis of *Republic Aviation, Babcock & Wilcox* and *Steelworkers* leads us to conclude that an essential task for the Board is "working out an adjustment between the undisputed right of self-organization assured to employees . . . and the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation, supra*, 324 U.S. at 797–798, 65 S.Ct. at 985. As between these "organization rights" and "property rights" the "[a]ccommodation . . . must be obtained with as little destruction of one as is consistent with the maintenance of the other." *Babcock & Wilcox, supra*, 351 U.S. at 112, 76 S.Ct. at 684.

In other words, the vital issue which the Board should have considered more fully in this case is balancing the diminution of the employees' § 7 rights as the result of the subject rule against the interests of McDonnell being protected by the rule. In that balancing process, the Board should have determined whether the former sufficiently outweighed the latter to necessitate the order voiding the contested parts of the rule.

■■ We do not mean to say that the Board cannot, pursuant to *Republic Aviation,* hold that a rule infringing § 7 rights is presumptively invalid and must be justified. We do hold, however, that when, in attempting to rebut that presumption, an employer makes a creditable showing of special, justifying circumstances, as was done in this case, the Board in weighing that evidence must responsibly and in a meaningful way consider the importance of the proffered justification and thereby determine whether the actual impact of the contested rule upon § 7 rights mandates the

invalidation of the rule. It is also appropriate to observe that the burden of proving the unfair labor practice charge is upon the General Counsel. NLRB v. Superior Sales Inc., 366 F.2d 229, 233 (8th Cir. 1966); NLRB v. Southern Transport, Inc., 343 F.2d 558, 560 (8th Cir. 1962); Bituminous Material & Supply Co. v. NLRB, 281 F.2d 365, 367 (8th Cir. 1960); Local No. 3 v. NLRB, 210 F.2d 325, 328–329 (8th Cir.), cert. denied sub nom. Local No. 3 v. Wilson & Co., 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648 (1954).

Seemingly, the examiner and the majority of the Board were unduly influenced by the Masterson Incident. Thus, members Miller and Fanning stated "[w]e agree with the trial examiner's conclusion . . . that the Respondent's no-distribution and no-solicitation rules as interpreted and *applied* in the context of this case, unlawfully interfered with employee rights. . . ." 78 LRRM at 1706 (emphasis supplied). There is no evidence in this record, however, to show the rule has ever been applied. The Masterson Incident occurred on September 17, 1970, and the rule in question was not posted until September 21, 1970. We find no evidence to show that the rule had been arbitrarily or unreasonably applied, or for that matter, applied in any manner after it had been promulgated and posted.

The Board also makes much of the term "reasonable time" appearing in the rule. The argument is made in the Board's opinion that the term is "so vague that employees cannot know what they may and may not do." We are not impressed with this argument. The word "reasonable" is, like "due process", one which, despite its elasticity, has a well-settled place in the law. Black's Law Dictionary defines "reasonable" as

"Just; proper. Ordinary or usual. Fit and appropriate to the end in view. . . . [N]ot immoderate or excessive, being synonymous with rational; honest; equitable; fair; suitable; moderate; tolerable."

Black's Law Dictionary 1431 (4th ed.) Furthermore, the term "reasonable" is quite often used in management-rights clauses of labor contracts empowering the employer to make "reasonable rules." *See, e. g.,* Aro, Inc., 47 L.A. 1065, 1067 (1966); American Zinc Co., 20 L.A. 527, 528 (1953). Indeed, the question of the "reasonableness" of plant rules is so often arbitrated that the indices have a separate category for cases involving that issue. See § 118.25 of the Cumulative Digests to the Labor Arbitration Reports. The federal courts are also called upon to determine the "reasonableness" of certain actions in labor relations. *See, e. g.,* Morton Salt Co. v. NLRB, 472 F.2d 416 (9th Cir., 1972).

More specifically, the term "reasonable time" (or "reasonable period") is frequently used in the law, including labor law. It enjoys a particular place in the law of sales, *see, e. g.,* Richardson v. Dolah, 429 F.2d 912 (9th Cir. 1970); Southern Materials Co. v. Bryan Rock & Sand Co., 308 F.2d 414 (4th Cir. 1962); Simpson Feed Co., Inc. v. Continental Grain Co., 199 F.2d 284 (8th Cir. 1952), and in labor law it has been used, *inter alia,* in relation to the mandatory duration of certification. Franks Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); NLRB v. Appalachian Elec. Power Co., 140 F.2d 217 (4th Cir. 1944), the permissible duration of an employee's suspension, Cities Service Oil Co., 41 L.A. 1091, 1093 (1963), and, as in this case, as a gauge for the time period in which employees are expected to complete certain actions. National Lock Co., 12 L.A. 221, 223 (1949).

Considering the foregoing, we decline to hold that inclusion of the words "reasonable time" renders the rule invalid per se. To us, "reasonable time" connotes more fairness and tolerance for all concerned than does a fixed, arbitrary time, *e. g.,* 30 or 45 minutes, or one hour, before or after the employee reports for or leaves work. Of course, the flexibility of the language "reasonable time" could be arbitrarily and unreason-

ably enforced in order to limit solicitation and distribution, but such action obviously would result in unfair labor practice charges. The terminology could then be adjudicated, as it should be, on an ad hoc basis.

██ In sum, we conclude that the examiner and the majority rendered only lip service to the balancing of interests test. This record conclusively shows that McDonnell is engaged in highly sophisticated operations in manufacturing aircraft, missiles, space vehicles, and military airplanes, and that much of its production is militarily sensitive and classified secret by the United States government. It can hardly be gainsaid that McDonnell should be permitted to exercise such control over its premises and its employees when they are not on duty as to afford adequate protection to these operations. Of course, petitioner cannot interfere with its employees' rights to distribute literature and orally solicit on behalf of unions except to the extent it is necessary to maintain production, discipline, security or other important interests. But the Board's majority failed to consider responsibly and give weight to all of the relevant factors which are involved in the extensive operation of McDonnell, and failed to work out an adequate adjustment between the undisputed right of self-organization assured to the employees and the equally undisputed right of McDonnell to maintain discipline and security in its establishment. Accordingly, we feel impelled to remand to the Board for further consideration and action. Denying enforcement might be justified under the rationale of the Third Circuit in two cases involving no-solicitation rules bearing striking resemblance to the instant rule. See Diamond Shamrock Co. v. N.L.R.B., 443 F.2d 52 (3rd Cir. 1971); NLRB v. Rockwell Mfg. Co., 271 F.2d 109 (3rd Cir. 1959). We prefer, however, because of the interest of McDonnell, its employees and the public, to remand to the Board and thereby afford that agency another opportunity to fashion a remedy and frame an order which will in a meaningful way protect the rights of all concerned. The Board, of course, may receive additional evidence as deemed essential to an appropriate resolution of the controversy.

██ It is not our function to delineate the precise standards to be applied upon remand in balancing the interests of the parties. The Board in its expertise is more qualified to perform this function. We do suggest, however, that on remand the Board would be well advised to give consideration, *inter alia*, to (1) permitting distribution on the parking lots during the day shifts as distinguished from the night shifts; (2) whether there are other means of access or communication available to employees for distribution and solicitation such as entrances to the parking lots and to the avenues considered in *Diamond Shamrock* and *Rockwell Mfg. Co., supra*; and (3) the status of an employee as related to his § 7 rights once he has left the premises.

██ By way of addendum we emphasize our recognition of the distinction to be drawn between employees' and non-employees' rights under § 7. We have heeded the Supreme Court's admonition in this regard as enunciated in the *Republic-LeTourneau*, and the *Babcock-Wilcox* cases. What we find as we construe these cases is that in both instances the Board is to consider the balancing of interests of both parties. In this connection, we suggest that once the employee has left his employer's premises and returns to engage in union activity, he may have attained a status as to § 7 rights somewhere between that of an employee and that of a non-employee. In other words, under those circumstances, are his privileges to contact fellow employees closer akin to the latter than the former?

In denying enforcement and remanding for further consideration, we deem it unnecessary to elaborate further on the Masterson Incident or decide the propriety of the Board's order particu-

larly as no separate order was premised upon that violation. It is abundantly clear to us that the Masterson Incident is not the relevant issue in this case. Rather, the crucial question is whether the contested part of the rule must be invalidated.

Enforcement denied, remanded for further proceedings not inconsistent with the views expressed in this opinion.