## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## AERO CORPORATION, Respondent.

No. 78–1322

Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Oct. 5, 1978.

Elliott Moore, Deputy Assoc. Gen. Counsel, Andrew Tranovich, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N. L. R. B., Washington, D.C., for petitioner.

Branch & Swann, Donald G. Mayhall, James P. Swann, Jr., Atlanta, Ga., for respondent.

Harold A. Boire, Director, Region 12, N. L. R. B., Tampa, Fla., for other interested party.

Before MORGAN, CLARK and TJOFLAT, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This case comes before the court upon application of the National Labor Relations Board for enforcement of its decision and order in *Aero Corporation,* 223 NLRB No. 64 (1977). The Board found that the employer violated § 8(a)(1) of the National Labor Relations Act by the unlawful surveillance of a union meeting and through the coercive interrogation of an employee. Additionally, the Board held that the employer's temporary layoff of three workers constituted anti-union discrimination within the proscription of § 8(a)(3). Finding that these determinations are anchored in substantial evidence, we enforce the Board's order.

The alleged unfair labor practices stem from union organizational activity at the company facility in Lake City, Florida. Aero Corporation engages some five hundred employees in the overhaul and repair of C–130 aircraft. Early in September, 1976 a member of this work force sought information about union organizing and contacted representatives of the Truckdrivers, Warehousemen and Helpers Local Union No. 512, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. As a result of this inquiry, James Wheeler, a union officer from Jacksonville, came to Lake City on

* Rule 18, 5 Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

September 19 and met with an unnamed individual to discuss organizing possibilities.[1] It was agreed that Wheeler would return to Lake City to talk with other Aero employees on Sunday, September 26, at 2 p.m. This meeting to be held in the picnic area at Young's Park, was not publicly announced or advertised, but was publicized through word-of-mouth. At the appointed time and place, some thirty employees gathered to await the arrival of Wheeler. Soon, however, the employees observed the presence of company supervisor Leon Patterson sitting in a car roughly 150 feet away and apparently observing the meeting. The reasons for Patterson's presence, as well as its duration, are subject to conflicting testimony. It is clear, though, that as a result of Patterson's presence, the gathering dispersed to reconvene in a motel a few blocks away. At this rescheduled meeting, with a reduced attendance of 21, plans were made to launch a union drive.

On the next day, a Monday, the company's vice president somehow learned of union activity[2] and on Wednesday, September 29, all employees were assembled to hear a speech by the company president. This speech urged the workers to consider the company's side as well as the union viewpoint.[3] Later that afternoon, a company supervisor took aside employee John Grubbs and questioned him about union efforts.

The next day found union officials from Jacksonville distributing literature at the plant gate. Employee Grubbs was given copies of the leaflets and asked to post them on bulletin boards. Pursuant to a valid no-solicitation rule, these leaflets were removed by supervisor Billie Putnam who remarked, "Who in the hell is posting all those posters." On Friday, October 1, company supervisors observed leaflets posted on the tool boxes of union supporters Grubbs and Brannen. That same day, these two men and a third union supporter, Fowler, were laid off along with five workers at another station.[4] The union supporters were not recalled until early December; the others resumed work within a month. From these facts, the Board found Aero Corporation guilty of three different unfair labor practices.

### Section 8(a)(1): Surveillance of the Meeting at Young's Park

The Board found that when supervisor Leon Patterson sat in a parked car 150 feet from employees assembled in the picnic area, he conducted illegal surveillance of union activity in violation of § 8(a)(1) of the National Labor Relations Act. *See* 29 U.S.C. § 151 *et seq.* The law is clear that an employer's surveillance of union activity can unlawfully inhibit the exercise of rights to concerted action. *E. g., NLRB v. Texas Electric Cooperatives, Inc.,* 398 F.2d 722, 724 (5th Cir. 1968). Although Supervisor Patterson was in a public place, this does not preclude a finding that an unfair labor practice occurred. In *NLRB v. Speed Queen,* 469 F.2d 189, 191 (8th Cir. 1972), the court held that a plant manager sitting in a parked car in a supermarket parking lot conducted illegal surveillance of an employees' meeting in an adjacent inn. Aero insists that Patterson did not engage in any such surveillance. He allegedly came to Young's park to pick up his son from a tennis match rather than to spy on workers. Moreover, Patterson testified that his

1. The identity of this person was never revealed—allegedly, due to fear of company reprisal.

2. The vice-president testified that a supervisor informed him of the incipient organizational efforts. He did not recall, however, which supervisor had spoken to him.

3. There is no contention that this speech affronted Section 8(a)(1) of the Act.

4. The five other employees worked in the Company's commercial project—an entirely different operation from the Navy project where Grubbs, Brannen and Fowler were employed. The fact that this commercial project had less work to perform had no bearing on the Navy project. Interestingly, although these other five, who were evidently not involved with the union, had less than two months seniority, they were recalled within a month. Of the three union sympathizers, one had worked for three years, the other two for seven. After their layoff, they were not recalled for nine weeks.

faulty vision prevented him from identifying the persons attending the meeting or even realizing that a union organizing session was taking place.

The Administrative Law Judge discredited Patterson's testimony. Accepting our limited scope of review, we cannot say that the determinations adopted by the Board were "inherently unreasonable" or "self contradictory." *NLRB v. Finesilver Mfg. Co.,* 400 F.2d 644, 645 (5th Cir. 1968). We cannot reject as untenable the examiner's resolution of testimonial conflicts in favor of the charging parties. Patterson claimed that he sat for ten minutes in his car, and that his poor vision prevented recognition of the participants. The Administrative Law Judge chose to credit testimony that he sat for 30 to 40 minutes engaged "in no activity other than looking into the area where the employees were assembled," and that Patterson's professed defects of vision were contradicted by his own testimony that he recognized other persons in the park located at substantial distances away. We accept the version endorsed by the Administrative Law Judge who actually heard the witnesses and assessed their character and demeanor. *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829, 832 (1962).

Furthermore, even if Patterson had originally come to Young's Park to pick up his son, he committed an unfair labor practice by remaining to conduct surveillance of the employees' meeting. This court held in *NLRB v. Standard Forge & Axle Co.,* 420 F.2d 508, 510 (5th Cir. 1969), that § 8(a)(1) was affronted when two company operatives sat for at least 30 minutes in a parked car near the union hall while an employees' meeting was in progress. Even though a personal errand accounted for their initial presence, "it was not unreasonable for the Board to find that Paul and Jenkins knew there was a Union meeting in progress and that they 'lingered there in order to keep the meeting under surveillance and thus violated Section 8(a)(1) of the Act.'" *NLRB v. Standard Forge & Axle Co., supra* (cite omitted).

Accordingly, we conclude that Patterson's surveillance abridged § 8(a)(1). While he maintains that he had no advance notice of the union meeting, common experience tells us that word-of-mouth communications among workers frequently reach the ears of management. Even had the Board credited his explanation for his presence in Young's Park, Patterson converted any justified appearance into unlawful surveillance by remaining to observe the gathering. The fundamental determinant of § 8(a)(1) liability is not subjective intention, but the tendency to inhibit protected activity. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Such an inhibitive tendency is manifest in this case. When organizer Wheeler arrived for the union gathering, an employee told him "This place is under surveillance by the company—we can't meet here." In fact, the employees refused to meet with Patterson nearby, and when they regrouped at the motel, approximately nine workers did not continue with the meeting. A chilling impact is obvious. Equally clear is the contravention of § 8(a)(1) by the employer Aero Corporation.

*Section 8(a)(1): The Questioning of Grubbs*

Several days after the gathering at Young's Park, while employee Grubbs was busy at work, supervisor John Brooks asked Grubbs to accompany him for a talk outside the building. Conflicting versions of this conversation have been advanced by Brooks and Grubbs. Brooks said that he had known Grubbs for over ten years and was his good friend, and that his inquiry related to a personal matter. Brooks also said that the subject of union activity was volunteered by Grubbs in response to Brooks' innocuous question as to how things were going. Grubbs, on the other hand, said he had known Brooks for a year or two and gave this version of the conversation:

He asked me, what was going on with the Union. I told him I didn't know what he was talking about. He kept asking me questions about how

many cards I had signed up—what kind of percentage did we have. He asked me if the Union was going to be at the gate the next day, and I told him no, we'd just have to wait and see. I didn't know anything about it. The other questions—I told him that I didn't know.

Q John, do you own a house?

A Yes, I do.

Q Mr. Brooks make any reference to your home?

A Yes, sir. He asked me—I had just bought the house, it was a new home—he asked me how my new house was—how I was coming along with my new home. And I told him fine, so far.

Q Anything else in the conversation that you recall?

A That was the only mention of the house. The rest of the conversation was about the Union. Finally, I just told him I had to get back to work, that it was getting close to time to get cleaned up and get ready to go home.

In finding this conversation an illegally coercive interrogation, the Board applied widely accepted criteria: (1) the history of the employer's attitude toward its employees; (2) the type of information sought or related; (3) the company rank of the questioner; (4) the place and manner of the conversation; (5) the truthfulness of the employee's responses; (6) whether the employer had a valid purpose in obtaining the information; (7) if so, whether this purpose was communicated to the employee, and (8) whether the employer assures employees that no reprisals will be taken if they support the union. *See Sturgis Newport Business Forms v. NLRB,* 563 F.2d 1252, 1256 (5th Cir. 1977).

Applying these factors, we find sufficient support for the Board's finding. While Aero Corporation has no anti-union history, the surveillance by Patterson was presumably fresh in the minds of workers. Additionally, the information sought entailed specifics of organizational activity. Fur-

ther, there is no showing that Brooks, the supervisor of quality control, was the type of low-level official engaged daily in familiar contact and comfortable conversation with workers. The exchange transpired not in a familiar social or workplace context, but after Grubbs was taken from his job during work hours to be questioned outside the building. During this questioning, Grubbs was evasive and professed ignorance of matters known to him. No valid purpose was advanced for the questioning; certainly no justification was made known to Grubbs. Finally, the requisite assurances against reprisals were not given. In essence, Grubbs was interrogated about his knowledge and involvement with union affairs for purposes that could only seem ominous. Indeed, testimony reflects that the interrogation had an unsettling impact on nearby workers who observed the questioning. Accordingly, we find that the Board's conclusion that Brooks illegally interrogated Grubbs is consonant with applicable case law and substantial evidence.

### Section 8(a)(3): The Layoff of Grubbs, Brannen and Fowler

The most serious violation found by the Board was the layoff of three workers assertedly due to the anti-union motives of the company. This action, held by the Board to violate § 8(a)(3) of the Act, was defended by the company as a reasonable business response to a reduced workload. Even were we to concede that this might have been a close question under a *de novo* review, for us, the answer is clear. We may not "displace the Board's choice between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456, 467–68 (1951). Furthermore, the Board is not required to establish substantial evidence that conduct is motivated solely by anti-union animus. It is sufficient if substantial evidence shows that the force of anti-union purpose was "reasonably equal" to the lawful motive

prompting conduct. *See NLRB v. Big Three Industrial Gas & Equipment Co.,* 579 F.2d 304, at 315–316 (1978); *Cramco, Inc. v. NLRB,* 399 F.2d 1, 6 (5th Cir. 1968); *NLRB v. Longhorn Transfer Service, Inc.,* 346 F.2d 1003, 1006 (5th Cir. 1965).

In accordance with this limited standard of review, we find that the Board has met its burden. One factor pointing to anti-union intentions by the employer is the occurrence of unfair labor practices, immediately prior to the layoff of the three union supporters: specifically, the surveillance by Patterson and the interrogation by Brooks. *See e. g., NLRB v. Big Three Industries, Inc.,* 497 F.2d 43, 49–51 (5th Cir. 1974). Also indicating improper motive is the fact that the company decision to order the layoffs was a highly unusual one. Testimony reflects that no one could recall layoffs ever being ordered before at Station 13, where the union sympathizers worked. In times past, a reduction in workload led to the men being shifted to different work posts. Such an irregular response that comes on the heels of the launching of a union campaign adds to the evidence of anti-union animus. *NLRB v. National Food Stores, Inc.,* 332 F.2d 249, 252 (7th Cir. 1964).

Moreover, the Administrative Law Judge properly attached significance to the statement of a supervisor who said of the three union supporters "Those people are never gonna work for me again." Additionally, it is significant that Grubbs was among the most active supporters of the union at the Aero facility. Brannen and Fowler stated in uncontradicted testimony that they supported the union cause energetically and visibly. When company-imposed detriment falls upon leading union supporters, the likelihood increases that antipathy toward unionism is involved. *Cf. NLRB v. Neuhoff Bros. Packers, Inc.,* 375 F.2d 372, 374 (5th Cir. 1967) (position of workers in union campaign a factor in determining unfair labor practice). While the employer maintains that it had no knowledge of the union activity of these three, the Administrative Law Judge's contrary conclusion is adequately supported. The surveillance by Patterson provided one opportunity to learn the identity of union activists. Additionally, company officials observed the union leaflets posted on the tool boxes of Grubbs and Brannen.

A final factor, the purported business justification for the layoffs can cut two ways in ascertaining motive. From the company's viewpoint, the alleged reduction in workload explained the need for the layoff thereby negating any inference of wrongful intentions. The Board, however, concluded that this allegedly transparent and contrived scheme of justification provided further proof that there was illegal conduct to be concealed. The validity of the proffered business justification raises factual issues best entrusted to the Administrative Law Judge and the Board. While we will not recount the many details of this evidentiary conflict, we briefly note two facts among others supporting the conclusion of the Board. During the period of the layoff, planes arrived for work at the Aero facility at a slightly greater frequency than during the preceding year. Additionally, workers at other stations were compelled to work overtime to perform the work done by the temporarily unemployed union supporters. Deferring to the credibility determinations and other fact finding by the Board, we conclude that the layoffs of Grubbs, Brannen and Fowler constituted anti-union discrimination in violation of § 8(a)(3).

While one can envision evidence more dramatically reflecting violations of the act than that before us, we bear in mind words from an earlier decision of this court: "Today the employer seldom engages in crude, flagrant derelictions. Nowadays it is usually a case of more subtlety, perhaps the more effective, and certainty the more likely to escape legal condemnation." *NLRB v. Neuhoff Bros. Packers, Inc.,* 375 F.2d 372, 374 (5th Cir. 1967). The order and decision of the Board is

ENFORCED.