**NATIONAL VENDORS, a Division of UMC Industries, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1888.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1980.

Decided Aug. 26, 1980.

---

Donald J. Meyer, St. Louis, Mo., for petitioner.

Joseph A. Schwachter, Atty., N. L. R. B., Washington, D. C., argued, Paul J. Spielberg, Deputy Asst. Gen. Counsel; William A. Lubbers, Gen. Counsel; John E. Higgins, Jr., Deputy Gen. Counsel; Robert E. Allen, Acting Associate Gen. Counsel; and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief, for respondent.

Before HEANEY and ARNOLD, Circuit Judges, and SACHS,* District Judge.

---

* The Honorable HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation.

HEANEY, Circuit Judge.

This case is before the Court upon the petition of National Vendors to review a decision and order of the National Labor Relations Board (NLRB). The NLRB cross-appeals for enforcement. We grant National Vendors' petition to set aside the Board's order and deny its enforcement.

I

BACKGROUND

National Vendors is engaged in the manufacture and distribution of vending machines and related products at five locations in the St. Louis, Missouri, area. This petition involves only Plant No. 3. The production and maintenance workers of that plant are represented by four different unions: the machinists' union, representing approximately 275 employees; the painters' union, representing fifteen employees; the polishers' union, also representing fifteen employees; and the electricians' union, which represents two employees. These four unions are jointly certified to represent the plant's employees and negotiate a joint contract.

Approximately 210 to 215 bargaining unit employees, along with sixty-five office employees and supervisory personnel, work during the first of two shifts. Eighty to ninety bargaining unit employees and five or six other employees work the second shift.

The events giving rise to the Board's finding of an unfair labor practice occurred in the context of contract negotiations between National Vendors and the four unions in the plant. In October of 1978, employees at the plant made written suggestions to the various unions for a new collective bargaining agreement. The existing contract was to expire on March 1, 1979.

The first contract negotiation session was held on November 28, 1978, and representatives of the Company and all four unions were present. Also present was a contract negotiating committee whose members

were employees elected by each union at the plant. At this session, Christopher Nelke, a member of the negotiating committee elected by the machinists' union and chief steward on the second shift, requested to use the union's bulletin board for posting information on the progress of negotiations. This request was denied by National Vendors' Director of Personnel, Edwin J. Barutio.[1]

On the same day, Nelke held a meeting in the Company cafeteria during a ten-minute break in the second shift. The cafeteria is approximately fifty by ninety or one hundred feet in size and contains vending machines and twenty tables, seating a total of eighty people. Nelke stood behind a counter in front of the cafeteria and spoke to a group of approximately eighty people, including non-unit personnel. He stated that he had been denied the use of the bulletin board by the Company, but that he would inform them of the negotiations by holding meetings in the cafeteria or handing out literature.

A second meeting was held by Nelke on December 13, 1978, in the cafeteria during a ten-minute break period. At this meeting, Nelke and another member of the negotiating committee distributed a leaflet, signed by certain members of the union negotiating committee, entitled "What's Goin' On." At this meeting, Nelke again stood behind the counter in the cafeteria and explained the handout to those present. The handout and contract negotiations were then discussed. Again, non-unit personnel were present.[2]

The following day, Nelke was told by Barutio that he was not to hold any more meetings in the Company cafeteria. At the next contract negotiating session on December 21, 1978, Barutio repeated this instruction. James Bagwell, spokesperson for all four unions, agreed to the Company's position.[3] In early 1979, a union meeting was called and nine portions of the contract were discussed and voted on. Eventually, a new contract was negotiated and approved by the union membership.

On January 2, 1979, Nelke filed a charge with the NLRB, contending that National Vendors violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by refusing to permit employees to conduct meetings on nonwork time in the employee cafeteria. The Administrative Law Judge found National Vendors violated § 8(a)(1) and recommended that it be ordered to cease and desist from

> [p]rohibiting employees from holding meetings on nonworking time in the employee cafeteria in its Plant No. 3 * * for the purpose of informing employees concerning the course and progress of collective bargaining between Respondent and the Unions representing the production and maintenance employees at such plant * * * .

The Administrative Law Judge also recommended that the Company be required to post a notice at Plant No. 3 stating that it will no longer prohibit employees from holding meetings in its cafeteria. The Board, modifying only slightly the wording of the notice, adopted the recommended order of the Administrative Law Judge.

## II

### ANALYSIS

Section 7 of the NLRA, 29 U.S.C. § 157, gives employees the right to discuss

---

1. There is no charge in the complaint regarding access to the bulletin board.

2. On the second shift, five or six nonbargaining unit employees have access to the cafeteria. During the lunch period of the first shift, about sixty-five office employees have access to the cafeteria at the time the bargaining unit employees are using the cafeteria for lunch. There is no evidence in the record of how many employees actually use the cafeteria during break time since they may leave the plant during their breaks.

3. Bagwell testified at the hearing:

> I agreed with the [Company's] position not to hold meetings in the plant and was questioned why and explained why, because [the members of the negotiating committee] were all new and we hadn't agreed to anything at all. We had just been discussing proposals and when there was something that was necessary to go back to the membership and when we decided on something we would call a meeting and present the entire membership with what we had agreed on.

union matters and distribute union literature on company premises during nonworking time. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803–804 & n.10, 65 S.Ct. 982, 987–988, & n.10, 89 L.Ed. 1372 (1945); *McDonnell Douglas Corp. v. NLRB*, 472 F.2d 539 (8th Cir. 1973). Restrictions on the employees' exercise of section 7 rights during authorized nonwork time or in nonwork areas are presumptively invalid. *American Cast Iron Pipe Co. v. NLRB*, 600 F.2d 132, 135 (8th Cir. 1979); *McDonnell Douglas Corp. v. NLRB, supra,* 472 F.2d at 544. In this case, however, there is no charge or evidence that National Vendors prohibited employee discussions at lunchroom tables or other nonwork areas during nonwork time nor is there evidence here that the distribution of literature in the cafeteria during nonwork time was prohibited. Thus, we find no support in the record for the Administrative Law Judge's conclusion that

> Barutio, with Bagwell's concurrence, impose[d] a gag on employee discussion of union affairs at any time in any part of [National Vendors'] premises.

■ Rather, it is clear that the Company's prohibition was narrowly directed at the practice of holding structured large group meetings during breaks in a company cafeteria that is open to all employees, including supervisory and non-unit personnel. We think it clear that such meetings are disruptive, particularly when the cafeteria is simultaneously used by other employees including supervisory employees.[4] As the Board acknowledged in *A.M.C. Air Conditioning Co.,* 232 N.L.R.B. 283, 283 (1977), there may be "certain limited circumstances [in which] an employer can lawfully prohibit the use of a lunchroom during mealtimes for various loud or otherwise disrupting activities including certain normally protected concerted activities." (Footnote omitted.) *See also Farah Manufacturing Co.,* 202 N.L.

R.B. 666 (1973). We think this is one of those circumstances.

■ We also find no support in the record for the Board's conclusion that Barutio and Bagwell were attempting to keep the contract negotiations out of the hands of the elected negotiation committee. The committee members were free to discuss the progress of negotiations with fellow employees on the Company premises during breaks and before and after work. Further, they were free to, and, in fact, did distribute materials to employees about the negotiations. They were also free to discuss the negotiations at regular union meetings and meetings held to vote on the contract.

The Board also found that a request by Nelke to hold meetings at the machinists' hall was denied by Bagwell so as to limit employee participation and input to the negotiations. We not only doubt the validity of this finding but we question its relevance to this case since no unfair labor practice charge against the union has been filed.

■ National Vendors also contends that the union, through Bagwell, waived any rights the employees may have had to hold meetings in the cafeteria. We agree with the Board that Bagwell could not waive the rights of the employees to discuss contract negotiations on the employers' premises during nonwork time. *NLRB v. Magnavox Co.,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). However, even if we accept that the union attempted to waive certain rights of employees, the rule imposed by National Vendors does not restrict the right to discuss contract negotiations on the employer's premises during nonwork time. The rule goes solely to semi-formal meetings held in the cafeteria during short breaks by a member of the contract negotiating committee.

For these reasons, we find that National Vendors did not violate § 8(a)(1) of the Act and deny enforcement of the Board's order.

---

4. We note that a National Vendors' foreman was in the lunchroom during one of Nelke's meetings. Employer surveillance of union activity can unlawfully inhibit employee exercise of section 7 rights. *See NLRB v. Aero Corp.,*

581 F.2d 511 (5th Cir. 1978). While there is no allegation in this case of such activity, additional meetings in the cafeteria with supervisory personnel present could raise questions of unlawful interference with employee rights.

ARNOLD, Circuit Judge, dissenting.

I would enforce the Board's order.

I have no quarrel with the general principles summarized in the Court's opinion, *ante*, at 1267–1268. There is no doubt that the discussion of contract negotiations that Christopher Nelke wished to engage in was an activity protected under Section 7. Company-imposed restrictions on this kind of activity in non-working areas on the employees' own time have been presumed invalid ever since *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Such restrictions "are violative of § 8(a)(1) unless the employer justifies them by a showing of special circumstances which make the rule necessary to maintain production or discipline." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 492–93, 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370 (1978) (footnote omitted). The balancing of interests that this test makes necessary is, in the first instance, the business of the Board, not the courts. "It is the Board on which Congress conferred the authority to develop and apply fundamental national labor policy . . . . The judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *Id.* at 500–01, 98 S.Ct. at 2473 (footnote omitted). See also, in addition to the cases cited on this point by the Court, *NLRB v. May Dept. Stores Co.*, 154 F.2d 533 (8th Cir. 1946).

Both the Board and the courts have applied this doctrine rather strictly in favor of the rights of employees. *AMC Air Conditioning Co.*, 232 N.L.R.B. 283 (1977), cited by the Court, *ante*, at 1268, is a good example. There, an employee addressed a group of 75 co-workers in a lunchroom in a loud voice. A foreman was eating in the room at the time and promptly reported the incident to the management. The employee was fired. An administrative law judge found the company's anti-speech rule reasonable and upheld it, but the Board reversed. No customers or visitors used the lunchroom, it said,[1] and there was no evidence that any employees had been disturbed by the speech-making. No rule banning speeches had previously been in force. The Board's order required the posting of a notice announcing, *inter alia* :

WE WILL NOT prohibit our employees from giving union-related speeches or other speeches concerning protected concerted activities in non-work areas including the lunchroom on their free time.

232 N.L.R.B. at 287.

*Farah Mfg. Co.*, 202 N.L.R.B. 666 (1973), also cited by the Court, illustrates both sides of the coin. An employee addressed a group in the company's cafeteria. The group "began to clap their hands and to make noises," *id.* at 701. Visitors and customers also used the room, *id.* at 707. In these circumstances, a company rule against speechmaking in the cafeteria was upheld. On the other hand, it was held to be an unfair labor practice to discharge an employee for speaking to a crowd of about 100 employees "in a very loud tone" in the "main hallway of the . . . plant during the lunchbreak," even though "some congestion in the hallway" was created. *Id.* at 666. As to the latter incident, the Board, reversing a trial examiner, said:

Alvarez [the discharged employee] was engaged in a protected concerted activity . . . . Respondent [Farah] had no right to limit it absent some showing that Alvarez' loud tone was creating a problem in any area of proper management concern. [There were no] demonstrably disturbing effects on plant business or operations such as distracting employees."

*Ibid.* Compare *McDonnell Douglas Corp. v. NLRB*, 472 F.2d 539 (8th Cir. 1973), in which this Court found that an employer engaged in highly sophisticated operations, some of which were militarily sensitive and

---

1. *But cf. Beth Israel Hosp. v. NLRB, supra*, 437 U.S. at 490, 98 S.Ct. at 2468, where an employer rule forbidding the solicitation of union support *and the distribution of union literature in a* cafeteria during nonworking time was held unlawful even though only 77% of the cafeteria's patrons were employees.

classified secret, had shown sufficient "special circumstances" to take itself out of the general rule of *Republic Aviation.*

As this brief reference to a few cases has, I hope, made clear, the key to resolution of this kind of case is an examination of the particular facts of each disputed situation. The Administrative Law Judge below (whose findings the Board adopted) made a thorough and judicious review of the testimony, and I cannot say that her findings are not supported by substantial evidence. She found, among other things, that Nelke had held four separate meetings in the cafeteria, each without incident or complaint from any employee. All of the meetings were held during a ten-minute break in the course of the second shift. The second-shift foreman was present at the first two meetings.[2]

After the fourth meeting, the company's Director of Personnel, having previously told Nelke he could not use the union bulletin board located in the plant, suddenly banned any further meetings. The ALJ found, as a matter of fact, that Edwin J. Barutio, the company official, told Nelke not only that he could not meet in the cafeteria, but that he could not talk to any group of people anywhere on company property.

In this situation, it does not seem especially important whether Barutio and the union's business agent were in league to cut off Nelke's access to his constituency, although I have no reason to doubt the validity of the ALJ's inference to this effect. Nor is it necessary for the Board to show that Nelke could not have used the union hall,[3] although the business agent, to say the least, was not hospitable to this request. The crux of the matter is that the company never showed that Nelke's meetings had been or would be disruptive. Barutio expressed fears of disruptive tendencies and

potential disturbances, but the ALJ found, permissibly in my view, that they were without substance. The mere potentiality of disruption should not be sufficient to override the important Section 7 rights of an elected union official to keep the membership informed of the progress of negotiations for a collective-bargaining contract.

Because I believe that the Board's findings are supported by substantial evidence, and that it has struck a balance between competing rights that accords with the national labor policy enacted by Congress, I respectfully dissent.

---

**2.** This may be what the Court refers to, *ante,* at 1267, when it says "non-unit personnel were present." There were no more than six supervisory personnel who worked the second shift.

**3.** "[T]he availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry

. . . ." *Beth Israel Hosp. v. NLRB, SUPRA,* 437 U.S. at 505, 98 S.Ct. at 2476. I do not understand this statement to intend any greater degree of protection for "organizational activity" than for other conduct protected by Section 7. *Cf. Eastex, Inc. v. NLRB,* 437 U.S. 556, 570 76, 98 S.Ct. 2505, 2514 2518, 57 L.Ed.2d 428 (1978).