# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 10, 2015          Decided January 21, 2016

No. 12-1072

DHL EXPRESS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 12-1143

———

On Petition for Review and Cross-Application
for Enforcement of an
Order of the National Labor Relations Board

———

*David A. Kadela* argued the cause and filed the briefs for petitioner.

*Barbara Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Usha Dheenan*, Supervisory Attorney, and *Nicole Lancia*, Attorney.

*Anton G. Hajjar* and *James B. Coppess* were on the brief for movant-intervenor American Postal Workers Union, AFL-CIO in support of respondent.

Before: ROGERS, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: DHL Express, Inc. (the Company) petitions for review of the December 22, 2011, decision and order by the National Labor Relations Board (NLRB or Board) finding the Company violated Section 8(a)(1) of the National Labor Relations Act (NLRA) by prohibiting nonworking employees from distributing union literature in the hallway of its facility. The Board seeks this court's enforcement of its order requiring the Company to cease and desist. We deny the Company's petition and grant the Board's cross-application for enforcement.

**I.**

This case is governed by Section 7 of the NLRA, 29 U.S.C. § 157, which dictates that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." It is a violation of the Act for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 . . . ." *Id.* §158(a)(1).

**Background**

DHL Express, Inc. is an express delivery service that moves mail and freight throughout the United States and in many foreign countries. DHL's only U.S. hub is located on

the grounds of the Cincinnati Airport in Erlanger, Kentucky (CVG). Jetliners arriving from domestic and international destinations taxi directly to the sort facility where a sophisticated system for unloading and reloading freight and package containers ensures items reach their final destinations. Over 1,200 workers are employed at the CVG facility which handles between 560,000 and 630,000 packages each week. Most of this loading and unloading activity occurs on the first floor and mezzanine level of the main sort building. The facility operates 24 hours a day with a part-time morning shift, part-time night shift, and a full-time day shift. In 2011, fourteen of DHL's employees were represented by the International Brotherhood of Teamsters. The American Postal Workers Union, AFL-CIO (APWU) had been attempting to organize the Company's remaining employees.

Because the facility is on the grounds of the Cincinnati airport, DHL must comply with the safety and security regulations of the U.S. Customs Service, the Federal Aviation Administration, and the Transportation Security Administration. To comply with these security requirements, ingress and egress to the hallway are controlled, with a security checkpoint located at the far end. The vast majority of DHL employees enter and exit through this main hallway of the administration building. The hallway is used by the company for a variety of purposes. It contains bulletin boards and wall-mounted television screens which display upcoming company events, weather reports, and production statistics. And there are computer stations employees can use during non-work time to view benefit and payroll information and to check personal email.

The Company has also used the hallway for company-sponsored events, scheduled and supervised by management.

4

DHL organized and hosted a Wellness Fair, Financial Fair, Education Fair, Autism Speaks fundraiser, and a promotion of the DHL-sponsored IndyCar, complete with free t-shirts and hats. These events were scheduled in advance with notice provided to employees, and they were held at the end of the overnight shift. Similarly, the collective bargaining agreement with the Teamsters provided for union access. Per that agreement, the Company permitted distribution of union literature provided the union gave advance notice and allowed DHL to specify the location and timing of the distribution. And the ALJ credited testimony that a fitness company was permitted to offer gym memberships, some employees sold Super Bowl Raffle tickets in the hallway, and off-duty employees talked on cell phones and had other social interactions while transiting the hallway.

However, certain work-related activities do occur in the hallway. Members of DHL's quality control team occasionally use the hallway to move damaged or misdirected packages to the front entrance. And company representatives frequently conduct tours for new employees and visitors, which stop in the hallway.

DHL's Employee Handbook includes a *Solicitation and Distribution* policy which prohibits "interference from persons who are pursuing a purpose not related to DHL's normal business" and forbids any solicitation by non-employees at any time unless "specifically authorized or sponsored by DHL." JA 56. Solicitation between employees is prohibited during work time or in work areas. *See id.* DHL also purports to have an "unwritten" policy which requires security staff to prevent employees from loitering or congregating in the hallway, except during company-sponsored or approved events. DHL admits its employees have never been officially notified of this security policy.

In December 2010 and February 2011, four different employees handed out union literature in the hallway. In December when Vida Manuel distributed flyers she was told by security staff that she could not handbill in the hallway. Manuel responded that "she had seen the Teamsters in the hallway doing it before at the tables and she thought she was able to do it also." JA 89, 353. Later that month, Manuel and fellow employees Bob Woodyard and James Hamilton handed out APWU's holiday newsletter, standing by the televisions. They were informed by Jennifer Miller, Captain of Security, that they could not loiter in the hallway but could handbill in the cafeteria or break room. When the employees complained that the Teamsters had been allowed to distribute literature, Miller reiterated that no employees were permitted to loiter in the hallway. Miller notified the Human Resources Manager who repeated the admonition. On February 25, 2011, Manuel, Woodyard, and Charles Teeters stood in the hallway handing out literature and displaying posters. They were again told it was against company policy to loiter and asked to move to the cafeteria, a break room, or an outside area. Each time the off-duty employees distributed literature for about 20 minutes. They left — sometimes reluctantly — when instructed to do so.

## Procedural History

The APWU brought two unfair labor practice charges against DHL, alleging that the Company violated Section 8(a)(1) by prohibiting employees from distributing union literature during non-work time in a non-work area of its facility on two occasions in December 2010 and once in February 2011. The Regional Director issued a Complaint on the charges on March 25, 2011.

On May 16 and 17, 2011, during a hearing before an Administrative Law Judge, the parties stipulated that, on three occasions, off-duty DHL employees who were distributing APWU literature in the hallway were told they could not loiter there, informed they could distribute the literature outside or in the cafeteria or breakroom, and were asked to leave the hallway.

The General Counsel claimed the hallway is a non-work area and thus DHL could not prohibit the distribution of union literature there. DHL countered that the hallway is a work area and that it had the right under its distribution policy, the legality of which is not at issue, to prohibit employees from leafletting there and to limit their leafletting to the facility's parking lot, cafeteria, and other non-work areas. The General Counsel also argued that even if the hallway was a work area, union distribution could not be prohibited because DHL had permitted other types of distribution in that area. DHL contended the other distributions were distinguishable and did not compromise the Company's right to enforce its distribution policy, especially because security-related considerations justified the prohibition.

On July 21, 2011, the ALJ found DHL violated Section 8(a)(1) by preventing off-duty employees from distributing union literature in the hallway — which he described as a "mixed-use" area of the facility. Specifically, the ALJ found DHL "compromised the hallway area by permitting non-work use of it." JA 26-29. DHL raised several exceptions to the decision and the Board issued its own decision and order on December 21, 2011. Two Board members agreed with the ALJ that the hallway constituted a "mixed-use" area in which DHL could not prohibit distribution during non-work time. The third, Member Hayes, concluded the hallway was a work area but would have found a violation because, in his view,

the Company's policy discriminated against the union. The Board ordered DHL to cease and desist from enforcing its no-distribution rule and to notify employees that the rule will not be enforced in the hallway.

On January 31, 2012, DHL petitioned for review in this court; the Board filed a cross-application for enforcement.

## II.

This court's "role in reviewing an NLRB decision is limited." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011). "[A] decision of the NLRB will be overturned only if the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Judicial review of the Board's credibility determinations is especially deferential: such determinations must be sustained unless they are "hopelessly incredible or self-contradictory," *Teamsters Local 171 v. NLRB*, 863 F.2d 946, 953 (D.C. Cir. 1988), or "patently insupportable," *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1246 (D.C. Cir. 1994).

However, deference is not warranted where the Board "fails to adequately explain its reasoning," where the Board leaves "critical gaps" in its reasoning, *Point Park Univ. v. NLRB*, 457 F.3d 42, 49-50 (D.C. Cir. 2006), or where the Board erred in applying law to facts, *Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 834 (D.C. Cir. 1998). But the court may not overturn a Board's order merely

because the court "might have reached a different conclusion had the court considered the issue de novo." *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1282 (D.C. Cir. 1999).

## A. Jurisdiction

In its brief, DHL emphatically urges that the Board's "mixed-use" presumption is "unreasonable, irrational, and arbitrary." But the Board argues this rationality argument was not presented below and so is not properly before the court.

We are, of course, precluded from considering any issue raised by a party for the first time on appeal. *See Pirlott v. NLRB*, 522 F.3d 423, 433 (D.C. Cir. 2008) ("It is . . . well understood that a reviewing court must confine itself to the grounds upon which the record discloses that the agency's action was based."); *see also* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). The question then is whether DHL challenged the rationality of the "mixed-use" presumption below in a manner sufficient to put the Board on notice.

The ALJ's opinion explicitly characterized the hallway as a "mixed-use" area. The ALJ therefore applied the Board's longstanding "mixed-use" presumption: that an employer cannot prohibit non-worktime distribution of union literature in a mixed-use area, absent a showing of special circumstances. In its exceptions to the ALJ's findings, DHL seemed to accept this mixed-use presumption. *See, e.g.*, JA 53-54 (citing, without question, Board precedents holding that a mixed-use area is "usually properly treated as a non-work area for purposes of application of these principles"). Indeed, DHL appeared to be challenging the *application* of this

presumption here — not its validity. *See, e.g.*, JA 55 ("The ALJ's decision that the hallway is not a work area is flawed because it fails to recognize the substantial evidence of work-related activity that regularly occurs in the hallway."). Only a single exception and a single sentence in its appeal before the Board arguably go to the validity of the presumption. *See* JA 35 ("Respondent excepts to the ALJ's finding that a mixed-use area must be treated the same as a non-work area for purposes of application of a no distribution rule."); JA 56 ("To conclude as a matter of law, as the ALJ did, that a non-work area and a mixed-use area are equivalent would be to abandon the Board's responsibility to balance employees' Section 7 rights against an employer's property and management rights and to accommodate each with as little destruction of one as is consistent with the maintenance of the other.").

Our precedent indicates a "vague exception" to an ALJ's finding may be sufficient "to preserve an issue for appeal when petitioner's 'brief in support of its exceptions' adequately put[s] the Board on notice" of the grounds on which the petitioner is objecting. *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 417-18 (D.C. Cir. 1996) (discussing *NLRB v. Blake Constr.*, 663 F.2d 272, 283-84 (D.C. Cir. 1981)). Alternatively, when a petitioner "specifically object[s] in its exceptions to the ALJ's findings," then the issue may still be preserved for appeal even though the petitioner "did not brief and argue the issue to the Board." *Id.* (discussing *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162 (D.C. Cir. 1993)). Here, we have neither a clear statement in DHL's exceptions nor a less-than-clear statement that is fully explained in the brief. This case is most similar to *Highlands Hospital Corp. v. NLRB*, in which we held the company's "single reference to the 'excessive breadth' of a remedy with multiple parts [was] insufficient to satisfy

section 10(e) because it failed to give the Board 'adequate notice' of the argument it [sought] to advance on review." 508 F.3d 28, 32-33 (D.C. Cir. 2007). We are therefore precluded from considering any direct challenge to the Board's mixed-use presumption.

But a close reading of the Company's arguments below indicates that, while DHL seemed to accept the Board's general mixed-use presumption, the Company *did* challenge the ALJ's application of that presumption — claiming the ALJ's purported classification of any area not *exclusively* devoted to work as "non-work" or "mixed-use" was a novel misapplication of Board precedent to which the Board acquiesced. For reasons explained more fully below, we conclude the ALJ's decision relating to mixed-use areas also was controlled by long-settled precedent.

## B. The Balancing of Rights

The Board and the employers are often not on the same page. In this case, they might not even be reading from the same book. For example, the Board, affirming the ALJ, concludes the hallway is a "mixed use" area in which union solicitation may not be prohibited. DHL, however, sees the operative principle quite differently. DHL contends that the working area of a business includes more than its production, inventory, and active processing space. Every sizeable business also requires administrative space where the business's payroll, human resources, accounting, security and other support services are housed. Thus, DHL argues work necessary to the operation of the business is being performed in such spaces. And these areas remain as much under the control of the employer as the active manufacturing or processing facilities. In this case, the hallway is part of the administrative portion of the facility, and — being integral to

the Company's commitment to maintain a secure facility — is made available to both outsiders and employees for limited purposes on a schedule established by management. These purposes, DHL maintains, must be congruent with the Company's need to inform and provide benefits and assistance to employees and to promote Company objectives. Thus, APWU's insistence that off-duty, pro-union employees may use this space for organizing activity without the company's permission and without being relegated to a particular time and place is viewed by the Company as an unwarranted disruption of the discipline DHL attempts to maintain in this administrative space and a violation of the Company's property rights.

DHL correctly identifies *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), as the seminal case articulating the Board's responsibility to balance employees' right to self-organize against employers' right to maintain discipline in their establishments. *See id.* at 803 n.10 (upholding the Board's presumption that it is "not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property" absent special circumstances). The Court in *Republic Aviation* recognized neither right was unlimited, a principle that was refined in *NLRB v. Babcock & Wilcox Co.*: "Accommodation between [employee-organizational rights and employer-property rights] must be obtained with as little destruction of one as is consistent with the maintenance of the other." 351 U.S. 105, 112 (1956).

Still, Congress entrusted the task of balancing between these conflicting legitimate interests to the Board, not the judiciary. *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978). If the Board's resolution is rational, consistent with

the Act, and supported by substantial evidence, it must be enforced. *Id.*

Unfortunately for DHL, there is less to the protection of employer property rights and managerial prerogatives than the language of accommodation seems to suggest. The locus of the accommodation between Section 7 rights and private property rights "may fall at different points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context." *Hudgens v. NLRB,* 424 U.S. 507, 522 (1976). In practice, the locus of accommodation shifts on a sliding scale. When property rights are ascendant, labor organizers must show their need for access trumps the employers' right to exclude. When employee rights are at their zenith, employers need to make an affirmative showing that organizational activity cannot be accommodated without negatively impacting productivity, discipline, security, or similarly important interests. Employer rights are at their strongest when dealing with non-employees. Employers can generally prohibit solicitation and other labor organizing activities by nonemployee union representatives. An employer cannot be compelled to allow nonemployee organizers onto his property. *See Lechmere, Inc. v. NLRB,* 502 U.S. 527, 534 (1992). "Nonemployee organizers cannot claim even a limited right of access to a nonconsenting employer's property until '[a]fter the requisite need for access to the employer's property has been shown.'" *Id.* (quoting *Centr. Hardware Co. v. NLRB,* 407 U.S. 539, 545 (1972)).

In contrast, the employer's ability to restrict pro-union activity by an off-duty employee legally on the premises — in a non-work area — is quite limited. *See ITT Indus. v. NLRB*, 251 F.3d 995, 1001 (D.C. Cir. 2001). When organizing activity is undertaken by employees lawfully on the

employer's property, the proper balance is between their right to organize and an employer's managerial rights. *See, e.g.*, *Hudgens*, 424 U.S. at 521 n.10 (1976) ("A wholly different balance was struck when the organizational activity was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved."); *Babcock*, 351 U.S. at 112-13 ("Here the Board failed to make a distinction between rules of law applicable to employees and those applicable to nonemployees. The distinction is one of substance. No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline."). Indeed, the Court has specifically held that "the Board is entitled to view the intrusion by employees on the property rights of their employer as quite limited in this context as long as the employer's management interests are adequately protected." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 574 (1978).

DHL argues that "[d]rawing such a presumption with respect to mixed-use and incidental-work areas conflicts . . . with the very distinction that the Supreme Court endorsed in *Republic Aviation* — the one between working and non-working areas." Pet. Br. 29. However, as *Babcock* makes clear, distinctions between employees and non-employees and between property rights and managerial rights may dramatically shift the balance. An employer may lawfully prohibit employees from distributing union literature in work areas during work time; however, a rule that extends the prohibition to nonworking areas during nonwork time is presumptively invalid. *See NLRB v. Transcon Lines*, 599 F.2d 719, 722 (5th Cir. 1979). The Board still adequately protects the employer's management interests by maintaining the special circumstance exception available to employers for

non-work areas.[1]  DHL's argument that the Board was required to conduct a balancing of its *property* interests against its employees' organizational interests is inapt.  *See Hudgens*, 424 U.S. at 521 n.10.  The company ignores the differences between employees and strangers and fails to distinguish property rights from managerial rights.  DHL thus misapprehends the critical point:  while the Company may be able to dictate the terms of access to strangers, contractors, and other business invitees, "no restriction may be placed on the employees' right to discuss self-organization *among themselves,* unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." *Lechmere, Inc.*, 502 U.S. at 533.

## C. Deference

In an attempt to escape the high level of deference accorded to agency action, DHL also claims the Board's mixed-use presumption is "arbitrary" and "conflicts with Supreme Court precedent."  As discussed above, these arguments are likely precluded because DHL failed to squarely raise them before the Board.  But to the extent DHL

---

[1] For example, in *Beth Israel Hospital v. NLRB*, the Supreme Court considered whether two industry-specific presumptions put forth by the Board were rational.  The Board found that rules prohibiting solicitation in the dining areas of public restaurants were presumptively lawful "because solicitation has the tendency to upset patrons," while also holding that prohibiting solicitation in the cafeteria of a hospital was unlawful "absent evidence that nonemployee patrons would be upset."  *Beth Israel*, 437 U.S. at 505-06.  The Court approvingly noted that "the Board [had] concluded that these rules struck the appropriate *balance* between organizational and employer rights in the particular industry to which each is applicable."  *Id.* at 506.  Similarly, in this context, the Board has concluded that mixed-use areas should not be subject to prohibitions on distribution unless the employer offers evidence of special circumstances.  This conclusion does not conflict with *Republic Aviation* or any other Supreme Court precedent.

is challenging the "heightened" presumption purportedly employed by the ALJ — that any area not "*exclusively*" devoted to work must be considered a mixed-use area — we consider and reject that challenge below.

Because Congress has given the Board such broad discretion, the Court must "uphold [the] Board rule as long as it is rational and consistent with the Act, even if we would have formulated a different rule had we sat on the Board." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990) (citation omitted). The Board has for decades — with court approval — found areas in which minimal or solely incidental work is conducted are to be considered "mixed-use" areas in which a prohibition on distribution during non-work time has to be justified by special circumstances. *See, e.g.*, *United Parcel Serv.*, 327 N.L.R.B. 317 (1998), *aff'd*, 228 F.3d 772 (6th Cir. 2000); *Transcon Lines*, 235 N.L.R.B. 1163, 1165 (1978), *aff'd*, 599 F.2d 719 (5th Cir. 1979); *Rockingham Sleepwear*, 188 N.L.R.B. 698, 701 (1971). Moreover, the Board has adequately explained the (rather obvious) reasons for applying the same presumption to mixed-use areas as to non-work areas: "[i]t is the main production area of an employer's facility where the hazards of littering and maintaining order are paramount over employee distribution of literature" such that employee distribution in these mixed-use areas "does not infringe" on the employer's interests in "conducting an orderly nonhazardous workplace." *Found. Coal West, Inc.*, 352 N.L.R.B. 147, 150 (2008); *cf. Patio Foods v. NLRB*, 415 F.2d 1001, 1003 (5th Cir. 1969) ("[T]he implicit holding of these cases is that an employer's legitimate interest in keeping his employees' work stations free of the disruptive influence of handbilling justifies the prohibition of union literature distribution in work areas where employees are, in fact, working.").

This presumption necessarily incorporates a balancing of employer and employee interests, and no court precedent prevented the Board from reasonably concluding the balance should be the same for non-work and mixed-use areas. Here, the ALJ and the Board applied this longstanding presumption to DHL's hallway, without modification. Although DHL fixates on the ALJ's finding that "the hallway is not *exclusively* a work area," JA 96, neither the ALJ nor the Board has heightened the standard for employers — a miniscule amount of nonwork will not now convert a work area into a "mixed use" area. An examination of the ALJ opinion, adopted by the Board, shows the ALJ carefully considered the type, duration, and frequency of work and nonwork occurring in the hallway prior to concluding that it should be considered a "mixed-use" area. *See* JA 96-98. Although DHL is alarmed by the "exclusivity" language employed by the ALJ, the record demonstrates that he was simply responding to the Company's argument that the hallway was a work area by stating all the reasons he could not find it to be *exclusively* so. *See id.* This analysis ultimately amounts to a run-of-the-mill application of the Board's traditional mixed-use framework.

While DHL may not agree with the underlying presumption, "it is to the Board that Congress entrusted the task of applying the Act's general prohibitory language in light of the infinite combinations of events which might be charged as violative of its terms." *Beth Israel*, 437 U.S. at 500-01. Moreover, the Board's mixed-use presumption is quite reasonable: it provides predictability for employers and employees, it includes a "special circumstances" exception for employers, and DHL's only proffered alternative is treating mixed-use areas, where very little work occurs, as equivalent to work areas — an outcome that "overcompensate[s] its

goals and give[s] too little weight to employee organizational interests." *Id.* at 501.

### D. Substantial Evidence

Having failed on its broader challenge to the mixed-use presumption, DHL still contends that the Board's finding that the hallway constituted a "mixed-use" area was not supported by substantial evidence. This court "must uphold the ALJ's findings of fact if substantial evidence exists in the record when viewed as a whole, to support them." *United Parcel Serv.*, 228 F.3d at 776; *see also Universal Camera Corp.*, 340 U.S. 474, 477 (1951). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir. 1987). Here, both the ALJ's findings and the Board's decision were supported by substantial evidence.

The Board has "long held that merely because a work function or functions occur in a given space does not render that space a 'work area' within the meaning of the Board's rules regarding distribution. Rather, the Board has looked at the quality and quantity of work, which occurs in the area at issue, and examine[d] whether the work is more than de minimus and whether it involves production." *Brockton Hospital*, 333 N.L.R.B 1367, 1375 (2001). To constitute a work area, "the area must be *integral*, not merely incidental, to the employer's main function." *Meijer, Inc.*, 344 N.L.R.B. 916, 923 (2005) (emphasis added); *see also U.S. Steel Corp.*, 223 N.L.R.B. 1246, 1247-48 (1976) ("Respondent's contention that all its property is a work area is a contention that can be asserted by every company, thus effectively destroying the right of employees to distribute literature. Some work tasks, whether it be cleaning up, maintenance, or

other incidental work, are performed at some time in almost every area of every company.").

Board precedent on this issue is instructive: for example, in *Santa Fe Hotel*, the Board identified "the main function of the Respondent's hotel-casino [as] to lodge people and permit them to gamble." *Santa Fe Hotel*, 331 N.L.R.B. 723, 723 (2000). Thus, the work activity — "security, maintenance, and gardening" — asserted by Respondent to occur at the facility entrance was merely incidental to its main function. *See id.* Other cases have followed the same line of analysis. In *Saisa Motor Freight*, the Board designated a break room as a "mixed-use area" because it was an area "where employees may take breaks and eat" but also "where line haul and city drivers receive[d] papers from dispatchers and turn[ed] in documents at the end of a trip." 333 N.L.R.B. 929 (2001); *see also Transcon Lines*, 599 F.2d at 721 (holding the Board's mixed-use designation to be supported by substantial evidence because the drivers' room was an area where employees could relax, drink coffee or eat snacks, and converse freely even though some work was occasionally conducted there); *United Parcel Serv.*, 228 F.3d at 777 (upholding designation of check-in area as "mixed-use" because that area "transformed into a congregation point for the drivers to drink coffee, read magazines and newspapers, and converse before their morning shift").

The Board's analysis of another hallway in *Foundation Coal* is particularly illuminating.[2] As in this case, the hallway there served as a place for employees to congregate, to view the bulletin boards, and to use communal goods like the

---

[2] Only two Board members decided *Foundation Coal*; the Board therefore found it unnecessary to rely on that precedent when deciding this case. *DHL Express, Inc.*, 357 N.L.R.B. No. 145 at 1 n.1 (2011). Regardless, the logic of *Foundation Coal* is instructive here.

company microwave and coffeemaker. *See* 352 N.L.R.B. at 148 ("There is no dispute that employees use the hallway to socialize with coworkers before, during, and after work."). Some work also took place in the hallway, namely dispatchers relaying new assignments to employees and human resource employees discussing safety and other issues with employees. *Id.* at 148-49. But the Board identified the employer's main function as "the digging, removal, sorting, and distribution of coal" and noted that "[t]his work is done primarily in the Pit and loading areas of Respondent's . . . mine." *Id.* at 150. Because of this, the Board concluded that "[a]t best the hallway is a mixed use area where both socializing and nonproduction work, incidental to Respondent's main function, the production of coal, take place. Employee distribution of written materials in the hallway does not infringe on Respondent's interests in conducting an orderly nonhazardous workplace for the mining of coal." *Id.*

So too with DHL's hallway: there is no question employees often congregate and socialize in the hallway. The hallway features televisions, where employees can watch for weather and company updates, computer stations for checking benefits information and personal email, and areas for employees to use their personal cellphones. Moreover, DHL has allowed the hallway to be used for various fairs, charity drives, raffles, and the sale of merchandise. The main function of DHL is the sorting and transfer of packages; this activity takes place in the sorting facility — not the hallway. Even though incidental work (like the carrying of packages and company tours) occasionally occurs in the hallway, the ALJ and the Board were justified in designating it as a "mixed use" area.

None of the cases relied on by DHL undercut this determination; "[t]he facts in those cases differ substantially

from the facts at issue here . . . . Those cases dealt with areas still retaining the characteristics of a work area but where non-working employees happened to be found . . . ." *United Parcel Serv.*, 228 F.3d at 777 (discussing the same cases DHL relies on in its briefing). DHL's contention that it provides alternative areas for organizational activities is also irrelevant. *See id.* at 778 ("[T]he NLRB has expressly found that a company may not prohibit the distribution of union literature in a mixed-use area, even though other non-work areas existed in the building"); *Beth Israel Hosp.*, 437 U.S. at 505 ("[O]utside of the health-care context, the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry . . . ."). The Board's mixed-use determination is therefore supported by substantial evidence on the record as a whole.

### E. Special Circumstances

Even when the Board finds an employer's prohibition is invalid, it is still "necessary to examine whether there are 'special circumstances' present which rebut the presumption of invalidity." *U.S. Steel Corp.*, 223 N.L.R.B. 1246, 1248 (1976). "Special circumstances" in this context means "problems associated with distribution which go beyond the normal problems of litter and production efficiency which the Board took into account in that case when it granted employers the additional limitation of banning distributions from work areas." *Id*.

DHL's facility is located on the grounds of an airport, and so the company must comply with several sets of federal safety and security regulations. Its security checkpoint for employees entering and exiting the building is located at one end of the hallway. DHL thus asserts that its security and safety concerns constitute "special circumstances" sufficient

to support a prohibition on the distribution of union literature in the hallway.

DHL need "show only a likelihood of, not actual, disruption or disturbance." *Brockton Hosp. v. NLRB*, 294 F.3d 100, 104 (D.C. Cir. 2002). And at least one court has previously admonished the Board for failing to give due consideration to an employer's safety and security concerns. In *McDonnell Douglas Corp.*, the Eighth Circuit held that "when . . . an employer makes a credible showing of special justifying circumstances, . . . the Board in weighing that evidence must responsibly and in a meaningful way consider the importance of the proffered justification." 472 F.2d 539, 545 (8th Cir. 1973). The employer in that case was "engaged in highly sophisticated operations in manufacturing aircraft, missiles, space vehicles, and military airplanes," and the court found that the Board gave too little weight to the employer's "security problems." *Id.* at 545-47.

The special circumstances question is a closer call here than whether the hallway is a mixed-use area. But the ALJ evaluated the specific argument put forward by DHL and concluded that, "[w]ith respect to security concerns, [a company director] testified that the employees did not break any Transportation Security Administration (TSA) policies or guidelines when distributing union literature in the hallway area, and [the human resource manager] testified that employees were not hindered in there [sic] ingress or egress from the facility." JA 27. The security concerns at DHL, while arguably above the norm, do not rise to the level of those in *McDonnell Douglas* where the employer was engaged in classified military work. Moreover, DHL was unable to point to any instance in which the distribution of union literature had in fact clogged the hallways, endangered other employees, or violated any security regulations. At oral

argument, DHL's counsel seemed somewhat ambivalent on this point. The Company could offer no specific evidence of disruption, instead arguing that its description of the security challenges should have been sufficient. But the Board has consistently held that the employer must point to "some specific evidence of unusual circumstances." *Meijer*, 436 F.3d at 545. Also, DHL's own contention that "[p]ermitting activities in the hallway that require employees to stop, even for a moment, [will] impede the progress of the throng of employees coming down the hallway, causing the hallway to become congested and creating the potential for a back-up," JA 40, is undermined by its allowance of so many other activities in the hallway — such as the use of cellphones and computers, socialization of employees, and even solicitation by a different union — none of which appear to have caused any safety or security problems.

Given the absence of evidence that discipline, production, or security had been adversely affected, the Board's determination was supported by substantial evidence on the record as a whole.

## F. Burden of Proof

Finally, DHL contends the Board improperly saddled it with the burden of proving that one or more on-duty employees received union literature, when the General Counsel bears the burden of proof with respect to employees being off-duty. As the Board held in *Stoddard-Quirk*, an unfair labor practice occurs when an employer prevents employees from distributing union literature in non-work (or mixed-use) areas during *non-work* time. *See Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615 (1962). And it is, of course, the General Counsel who "carries the burden of proving the

elements of an unfair labor practice." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983).

Here, both sides agree the employees distributing the literature were off-duty.  JA 80-81, 101.  And no evidence was adduced that these employees distributed literature to anyone who was on duty.  *See id.*  Board precedent, including court-approved precedent, does not seem to require the General Counsel to prove each and every employee who received the literature was off-duty.  *See Transcon Lines*, 599 F.2d at 722 ("The employer urges that the Board's proof failed because it was not shown that at the moment Brown handed out literature to other drivers . . . he was on non-work time, and that the precise moment each other driver was handed a piece of literature . . . he was in non-work status as well.  The employer's argument is specious with respect to Brown . . . [and] with respect to drivers who were handed pieces of literature, the precise nicety of proof hypothesized by the employer was not required.").

Obviously the employer is in a much better position to demonstrate that on-duty employees received the literature, and the Board has consistently looked to see whether any such evidence was adduced.  *See, e.g.*, *Oak Apparel, Inc.*, 218 N.L.R.B. 701, 702 n.7 (1975) ("In any event, there is no evidence that leaflets were distributed to any employees who were working . . . .").  Moreover, even if some on-duty employees received the distribution, some off-duty employees undoubtedly were prevented from receiving this literature because DHL repeatedly curtailed the distribution.  Board precedent and common sense dictate that the General Counsel was not required to prove that every single employee who

received APWU's literature was off-duty.[3] Rather, DHL had the option to demonstrate the contrary and failed to do so. Under the circumstances, we are satisfied that the General Counsel proved the unfair labor practice, regardless of whether some employees who received the distribution were on the clock.

## Conclusion

Substantial evidence exists on this record to support the Board's findings of fact and because we find no errors of law in the Board's decision, we deny the petition for review and grant the Board's application for enforcement.

---

[3] While not on precisely this point, the Sixth Circuit's discussion in *United Parcel Service* is instructive: "UPS contends that the NLRB impermissibly shifted the burden of proof to UPS on this issue, since no UPS supervisor admitted to seeing the drivers pass around newspapers or other reading materials. And, several managers testified that they threw away any reading materials if they happened to see them in the check-in area after the drivers had left. The ALJ pointed out, though, that there was also no evidence that UPS 'posted any warning notices, gave verbal warnings, or otherwise informed employees that the newspapers and magazines were being discarded pursuant to the no-distribution rule.' The ALJ inferred that the supervisors knew about the sharing of reading materials in the area since there was evidence that the supervisors routinely mingled with drivers while such distributions took place. *Thus, this is not a matter of shifting the burden of proof. It is merely a matter of whether the Court finds the ALJ's inference to be reasonable.*" 228 F.3d at 778 (emphasis added).