# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 19, 2020       Decided August 31, 2021

No. 20-1010

LOCAL 23, AMERICAN FEDERATION OF MUSICIANS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

On Petition for Review of an Order of
the National Labor Relations Board

*Matthew J. Ginsburg* argued the cause for petitioner. With him on the briefs was *James B. Coppess*.

*Milakshmi V. Rajapakse*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Peter B. Robb*, General Counsel, *Ruth E. Burdick*, Acting Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Julie B. Broido*, Supervisory Attorney.

Before: SRINIVASAN, *Chief Judge*, and HENDERSON and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

2

Concurring opinion filed by *Circuit Judge* HENDERSON.

SRINIVASAN, *Chief Judge*: The San Antonio Symphony contracts with the Tobin Center for the Performing Arts to perform most of its shows at the Tobin Center. After the Tobin Center barred the Symphony's musicians from distributing leaflets on the premises, the musicians' union filed an unfair labor practices charge. On review of the charge, the National Labor Relations Board revised its framework defining when a property owner can prohibit an onsite contractor's employees from accessing the property to engage in labor organizing activity.

The Board established a new test that would afford access rights to employees like the Symphony musicians in a narrower set of circumstances. The musicians' union does not dispute the Board's general discretion to revise its standards defining the rights of an onsite contractor's employees to access property for organizing activity. Instead, the union principally contends that the Board's new approach is arbitrary, both on its own terms and as applied in this case. We agree, and we therefore remand to the Board to reconsider the issue consistent with this opinion.

I.

A.

The San Antonio Symphony leases performance space from the Tobin Center for the Performing Arts, a facility owned and operated by Bexar Performing Arts Center Foundation. The Symphony musicians, whose organizing rights are at issue here, are employees of the Symphony, not the Tobin Center.

The Symphony, along with the Tobin Center's two other primary residents, the Ballet San Antonio and the Opera San Antonio, uses the Center's performance venues pursuant to a "Use Agreement." The Use Agreement entitles the Symphony to 22 performance weeks at the Tobin Center each year. In a typical performance week, the Symphony rehearses for three days (Tuesday to Thursday) and performs for three days (Friday to Sunday).

The Symphony musicians' terms of employment are set forth in a collective bargaining agreement (CBA) between the Symphony and the musicians' union, Local 23, American Federation of Musicians. The CBA guarantees the musicians 30 paid weeks in an annual season, spread out over a 39-week period (September to June). The Symphony musicians also perform work for the Ballet San Antonio, often also at the Tobin Center, but that work does not count towards the 30 paid weeks guaranteed by the CBA. Because the CBA entitles the musicians to 30 paid performance weeks with the Symphony but the Use Agreement provides for only 22 performance weeks for the Symphony at the Tobin Center, the Symphony musicians spend eight weeks at other venues such as the Majestic Theater, the Laurie Auditorium at Trinity University, the Barshop Jewish Community Center, and various churches and high schools in the San Antonio area.

## B.

During the 2016-2017 season, the Symphony musicians faced something of a work shortage because of financial difficulties. That year, the musicians agreed to a three-week furlough, reducing their paid performance weeks to 27. Adding to the challenges for the Symphony musicians, the Ballet went forward with a plan to use recorded music rather

than live Symphony music at certain of its shows at the Tobin Center.

When the Ballet opted to use recorded music in its February 2017 productions of Tchaikovsky's *Sleeping Beauty*, Local 23 decided to take action. Local 23 planned to engage in leafleting at the Ballet's performances at the Tobin Center to raise awareness and exert pressure on the Ballet to employ Symphony musicians in the future. The leaflets informed patrons that they would not hear a live symphony and encouraged them to insist on live music.

Shortly before the first February performance, ten to fifteen Local 23 members (primarily Symphony musicians) gathered in the Tobin Center's front plaza and began to hand out the leaflets to Ballet patrons. Tobin Center staff informed the Local 23 members that they could not leaflet anywhere on Tobin Center property. The staff suggested that the leafleters move to the public sidewalk across the street from the Tobin Center and distribute the leaflets there. The Local 23 members complied. The same sequence of events—attempted leafleting at the Tobin Center followed by compliance with a staff request to move across the street—played out at the three subsequent performances of *Sleeping Beauty*.

## C.

Local 23 filed unfair labor practice charges against Bexar (d/b/a the Tobin Center), and the Board's General Counsel subsequently brought a complaint. The ALJ applied the then-governing framework set out by the National Labor Relations Board in *New York New York*, *LLC*, 356 NLRB 907 (2011). Under that standard, a property owner may exclude a contractor's employees "who are regularly employed on the property" and who seek to engage in Section 7 organizational

activity "only where the owner is able to demonstrate that their activity significantly interferes with his use of the property or where exclusion is justified by another legitimate business reason." *Id.* at 918–19. The ALJ determined that the Symphony musicians worked regularly at the Tobin Center and that the Center had not shown significant interference with its use of the property or an alternative reason for exclusion. Thus, the ALJ found "that Respondent violated Section 8(a)(1) in preventing symphony employees from distributing flyers on the sidewalk in front of the Tobin Center between February 17 and 19, 2017." J.A. 33.

A divided Board reversed. The Board majority overruled *New York New York* and announced a new standard that broadens the circumstances in which a property owner can prohibit an onsite contractor's employees from accessing the property for labor organizing activity:

> [A] property owner may exclude from its property off-duty contractor employees seeking access to the property to engage in Section 7 activity unless (i) those employees work both regularly and exclusively on the property and (ii) the property owner fails to show that they have one or more reasonable nontrespassory alternative means to communicate their message.

*Bexar Cnty. Performing Arts Ctr. Found.*, 368 NLRB No. 46, at *3 (Aug. 23, 2019), J.A. 8–9. Applying that new standard, the Board found: (i) the Symphony employees did not work regularly or exclusively at the Tobin Center; and (ii) even assuming otherwise, the Symphony employees had alternative nontrespassory channels of communication to reach the general

public, namely, the sidewalk across the street as well as traditional and social media. *See id.*

The Board thus dismissed the General Counsel's complaint. Local 23 now petitions for review of the Board's decision.

II.

On review, "we will uphold the Board's decision if its ruling is not arbitrary, capricious, or founded on an erroneous application of the law, and if its factual findings are supported by substantial evidence." *Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 43 (D.C. Cir. 2018). We conclude that the Board's decision is arbitrary in the way that it implements its new standard for determining when a property owner may prohibit an onsite contractor's employees from conducting labor organizing activity on the premises.

A.

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. When the exercise of those Section 7 rights comes into conflict with an employer's property rights, the Board must find "a proper accommodation between the two." *Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972).

In that regard, the Supreme Court has drawn a distinction between the property owner's employees, on one hand, and nonemployee union organizers, on the other hand. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527, 532 (1992). When it comes to the property owner's employees, the "ability to

restrict pro-union activity by an off-duty employee legally on the premises—in a non-work area—is quite limited." *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 374 (D.C. Cir. 2016). But in the case of nonemployee union organizers, a property owner can generally prohibit their labor organizing activities on the premises. *Id.*

This case involves a third category of persons seeking access to property for the conduct of Section 7 activities: the employees of an entity that contracts with the property owner to perform work on the premises. Those employees do not work for the property owner itself, but instead work for an onsite contractor.

On two previous occasions, we have reviewed the Board's efforts to define the circumstances in which an onsite contractor's employees can access the premises for the conduct of labor organizing activity. *See New York New York, LLC v. NLRB*, 313 F.3d 585 (D.C. Cir. 2002) (*NYNYI*); *New York New York, LLC v. NLRB*, 676 F.3d 193 (D.C. Cir. 2012) (*NYNYII*). We first addressed the issue in *NYNYI*. There, the Board had treated contractor employees as equivalent to the property owner's employees, with the same broad rights of access. 313 F.3d at 587. We concluded that the Board's approach was inadequately explained. *Id.* at 588–91.

On remand, the Board revised its approach and established the standard applied by the ALJ in this case. *See New York New York*, 356 NLRB at 918–19. The Board no longer gave an onsite contractor's employees the same rights of access as the property owner's own employees; nor did the Board lower the access rights of contractor employees to those of nonemployee organizers. Instead, the Board adopted an intermediate approach, under which, as noted above, a property owner could exclude contractor employees from conducting

organizing activity on the premises "only where the owner is able to demonstrate that their activity significantly interferes with his use of the property or where exclusion is justified by another legitimate business reason." *NYNYII*, 676 F.3d at 198 (Henderson, J., concurring) (quoting *New York New York*, 356 NLRB at 918–19). We sustained the Board's revised standard. *See id.* at 196 & n.2.

In the present case, the Board has now chosen to revisit the issue a third time, this time on its own initiative. Rather than bring an onsite contractor's employees fully up to the level of the property owner's employees or fully down to the level of nonemployee organizers, the Board continues to apply an intermediate approach. But within that intermediate zone, the Board now seeks to grant a property owner broader rights of exclusion than the approach we upheld in *NYNYII*. *See Bexar*, 368 NLRB No. 46, at *2–3, J.A. 8–9.

The Board's new test, as set out above, operates in two steps. It grants a property owner the right to "exclude from its property off-duty contractor employees seeking access to the property to engage in Section 7 activity unless" two conditions are both satisfied: "(i) those employees work both regularly and exclusively on the property and (ii) the property owner fails to show that they have one or more reasonable nontrespassory alternative means to communicate their message." *Id.* at *3, J.A. 8–9. Local 23 challenges both of those steps as conceived and applied, and we consider the two steps in order.

B.

The first step calls for assessing whether the contractor employees work "regularly" and "exclusively" on the property. If not, they are treated as equivalent to nonemployee organizers and thus generally lack access rights. As the Board explains it,

the logic of the first step is that only contractor employees who meet those criteria have "a sufficient connection to" the property to merit Section 7 access rights.  *See Bexar*, 368 NLRB No. 46, at \*9, J.A. 12.  While contractor employees who regularly and exclusively work on the property are not employees of the property owner, neither are they "'strangers' to or 'outsiders' on the property."  *Id.* at \*11, J.A. 14.

As a conceptual matter, the Board acts in accordance with our decisions in aiming to identify those contractor employees with a sufficiently strong connection to the property to warrant the grant of access rights.  *See NYNYI*, 313 F.3d at 590.  But the Board's implementation of that aim in this case is arbitrary, both as to the condition that contractor employees work "regularly" on the property and as to the condition that they also work "exclusively" on the property.

1.

We begin with the Board's use of "regularly."  The Board "will consider contractor employees to work 'regularly' on the owner's property only if the contractor regularly conducts business or performs services there."  *Bexar*, 368 NLRB No. 46, at \*3, J.A. 9.  To work irregularly, by contrast, is to work "occasionally, sporadically, or on an ad hoc basis."  *Id.* at \*11, J.A. 14.

In finding the regularity criterion unmet here, the Board relied on the Symphony's seasonal schedule ("only 39 weeks of the year") and the number of weeks within that season that the Symphony performs at the Tobin Center ("only 22 weeks of the year").  *Id.* at \*14, J.A. 16–17.  As a result, the Board reasoned, "[f]or well over half the year, the Symphony is not present" at the Tobin Center.  *Id.* at \*14, J.A. 17.  On that basis alone, the Board concluded that the Symphony musicians did

not work regularly at the Tobin Center: "the Symphony[] did not regularly conduct business or perform services there because it only used the property for performances and rehearsals 22 weeks of the year." *Id.* at *3, J.A. 9.

The essential measure of regularity under that approach is the *frequency* of the work. If, instead of being present for less than half the year, the musicians had performed more frequently at the Tobin Center, they evidently would be deemed to have worked there regularly. However permissible that understanding of regularity may be as an abstract matter, though, it cannot be squared with statements the Board makes elsewhere in its decision. For example, the Board notes that "a contractor employee who stocks vending machines once a week at the property owner's facility works 'regularly' on the property." *Id.* at *9 n.56, J.A. 13. But if frequency is the salient measure of regularity, then back-of-the-envelope arithmetic confirms that working once a week (1/7) cannot count as regular presence if working 22 weeks of the year (22/52) does not. Defining regularity by way of frequency—as the Board did in applying the test here—renders the Board's decision internally inconsistent, and, as a result, arbitrary.

Perhaps recognizing that problem, the Board's briefing before our court attempts to reconceptualize the regularity inquiry as evaluating whether contractor employees access the property at "constant" or "definite" intervals. Under that definition, the Board can classify the vending machine operator as regularly on the property and the more-frequently present Symphony musicians as irregularly so. When the vending machine operator works onsite every Monday morning, she exhibits the necessary definiteness of appearance. The Symphony musicians, on the other hand, have a seasonal schedule and are often on the property in some months and not

at all during others. Their presence thus could be seen as "irregular."

There are two fundamental problems with that alternative conception of regularity. First, it is an after-the-fact alternative. It simply was not the basis of the Board's decision on the issue of regularity. Rather, as explained, the Board's reasoning in its decision hinged solely on the frequency of the musicians' presence, making no mention of any lack of constancy in the intervals between their appearances. And it is well-established that we cannot uphold an agency decision based on a post hoc justification. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Second, the Board at any rate fails to explain how the approach it newly introduces in its briefing before our court corresponds with an employee's connection to the property in any relevant way. After all, an employee (such as a schoolteacher) who frequently works long hours on the premises but takes occasional week-long breaks and two months off in the summer may not work on the property at constant or definite intervals. Nonetheless, he would seem to have a strong connection to the property—or at least stronger than the vending machine operator who comes to the property only one day a week (and even then, only for a small fraction of that one day). We are hard pressed to understand how the schoolteacher could be considered more of a "'stranger[]' to or 'outsider[]' on the property" than the vending machine operator. *Bexar*, 368 NLRB No. 46, at *11, J.A. 14. The post hoc explanation of regularity in the Board's briefing, then, cannot help the Board even if we could consider it.

12

2.

The first step of the Board's test requires that a contactor's employees not only work "regularly" on the property but also work "exclusively" on the property. Here, the Board found that the Symphony musicians did not work exclusively at the Tobin Center because "[t]hey also performed at the Majestic Theater and other venues throughout San Antonio, such as churches and high schools." *Bexar*, 368 NLRB No. 46, at *14, J.A. 16.

In defining "work exclusively" in that way, the Board failed to explain how the requirement connects to the logic of the first step of the test. Like the regularity requirement, the Board's exclusivity requirement aims to capture those employees who have a sufficiently strong connection to the property owner's premises to warrant access rights. And the Board contends that removing the exclusivity requirement would make "off-duty access to the owner's property possible for a myriad of contractor employees, some of whom spend only a small fraction of their workweek on the property owner's property." *Id.* at *11, J.A. 14. But exclusivity, as the Board conceives of it, is an ill-suited proxy for connection to the property.

The Board's understanding of exclusivity looks only at the contractor employee's work for a particular contractor: the Board "will consider contractor employees to work 'exclusively' on the owner's property if they perform all of their work for that contractor on the property, even if they also work a second job elsewhere for another employer." *Id.* at *3, J.A. 9. As a result, if a contractor employee works only a fraction of her workweek with a particular contractor but all of that work occurs on the property owner's site, the employee satisfies the Board's test. Conversely, if the employee works virtually her entire workweek at the property owner's property

yet occasionally works at a different site for the same contractor, she fails the Board's test. Those results stand significantly at odds with the Board's stated logic for the first step of its test—they fail to exclude workers with only a marginal presence while excluding others with a substantial presence. And neither the Board's decision nor its subsequent briefing offers any way to square the consequences of the exclusivity requirement with its stated purpose.

The Board's implementation of the exclusivity condition, then—as with its implementation of the regularity condition—is arbitrary. And, because those two conditions make up the first step of the Board's new test for determining when contractor employees have access rights to the premises for organizing activity, the first step of the Board's test cannot be sustained.

## C.

We now turn to the second step of the Board's new test. Notably, the test's two steps work in combination in the following sense. A property owner can exclude contractor employees from conducting Section 7 activity on the premises unless *both* steps are satisfied: (i) the employees work regularly and exclusively on the property; *and* (ii) "the property owner fails to show that they have one or more reasonable nontrespassory alternative means to communicate their message." *Bexar*, 368 NLRB No. 46, at *3, J.A. 8–9. In other words, the test grants the property owner the right to exclude contractor employees if either of the two steps is unsatisfied.

In this case, the Board determined at the first step that the employees did not work regularly and exclusively on the property. And, as the Board recognized, once it deemed the first step unsatisfied, it "could end the inquiry" right there.

*Id.* at \*14, J.A. 17.  Had it done so, however, its decision could not have been sustained given that its application of the first step was arbitrary, for the reasons we have explained.

The Board, though, opted not to end its inquiry upon finding the first step unsatisfied.  Rather, the Board "assum[ed] arguendo" that the Symphony's musicians worked regularly and exclusively at the Tobin Center, and it went on to assess whether the Tobin Center prevailed under the second part of the test, finding that the Tobin Center did.  *Id.*  That then raises the question whether we can sustain the Board's decision based on its application of the second step alone, notwithstanding the arbitrariness of the first step.   We conclude we cannot, as the Board's application of the second step in this case was itself arbitrary.

To understand why, it is necessary to appreciate the second step's design and function as the Board conceives of it.  That step, again, is satisfied if "the property owner fails to show . . . one or more reasonable nontrespassory alternative means."  *Id.* at \*3, J.A. 9.  Note that the property owner bears the burden in that regard: the question is whether "the property owner can prove that the contractor employees have reasonable alternative means for communicating their message."  *Id.* at \*11, J.A. 15.

The allocation of the burden of proof to the property owner is a critical component of the test's second step.  Recall that the object of the first step is to select certain onsite contractor employees—those who work regularly and exclusively on the premises—and afford them greater access rights for Section 7 activity than nonemployee organizers.  As the Board expressed the point, "contractor employees who work regularly and exclusively on the property owner's property have some Sec. 7 access rights and are not utter 'strangers' to the property like

nonemployee union organizers." *Id.* at *11 n.68, J.A. 15. And for nonemployee union organizers "[t]o gain access" to the property, "the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists." *Lechmere*, 502 U.S. at 535 (citation omitted).

In that light, the pivotal (and sole) difference between the *Lechmere* test for nonemployee organizers and the Board's new test for contractor employees who work regularly and exclusively on the property is the allocation of the burden. Under the *Lechmere* test, the nonemployee organizers must show the absence of reasonable alternative means in order to gain access to the property. Under the Board's new test, by contrast, it is the property owner that must show the existence of reasonable alternative means in order to prohibit access to the property. Absent that burden shift to the property owner, the Board's new test would be incoherent: contractor employees who distinguish themselves from nonemployee organizers by working regularly and exclusively on the property would gain nothing from doing so. If not for the burden shift, they, just like nonemployee organizers, would still have to prove that there are no reasonable alternative means of communicating their message.

The Board underscored the central role of the burden shift in its decision for precisely those reasons: "we emphasize that where contractor employees work regularly and exclusively on the owner's property and thus have potentially greater rights of trespassory access than nonemployee strangers, we place the burden on the property owner to show that the alternative means of communication is reasonable." *Bexar*, 368 NLRB No. 46, at *15, J.A. 18. *Cf. Lavine v. Milne*, 424 U.S. 577, 585 (1976) ("Where the burden of proof lies on a given issue . . .

frequently may be dispositive to the outcome of the litigation.").

Having emphasized the essential nature of the burden shift, however, the Board did not then follow through and apply any burden shift in its decision. For that reason, the Board's application of the test's second step was arbitrary.

As an initial matter, it bears reiterating that the preexisting *New York New York* test applied by the ALJ—the test displaced by the new standard announced by the Board in this case—did not contain any requirement to show the presence (or absence) of alternative means of communication. As a result, there had been no presentation of arguments or development of the record addressed to whether the Tobin Center could carry its burden to show the availability of reasonable nontrespassory means for the Symphony musicians to communicate their message: the parties had no awareness that the Board would establish a test containing such a requirement. In that situation, the Board might have remanded the case to enable the ALJ to develop a record and hear the parties' respective positions on the appropriate resolution of the case under the Board's newly minted test. But instead of doing so, the Board applied its new test without hearing any presentation of competing views or eliciting any record submissions addressed to whether the Tobin Center could carry its (previously unknown) burden.

In finding that the Tobin Center prevailed under the test's second step, the Board relied on two alternative means by which the Symphony musicians could communicate their message. First, the Board observed that the Symphony musicians "were able to leaflet on a public sidewalk across the street from the [Tobin Center's] property." *Bexar*, 368 NLRB No. 46, at \*14, J.A. 17. Second, the Board stated that the musicians "also had other channels they could have used to

convey their message, including newspapers, radio, television, and social media, such as Facebook, Twitter, YouTube, blogs, and websites." *Id.* The Tobin Center, however, bore no burden with regard to proving either of those ostensibly reasonable alternative means, undermining the basic rationale of the test's second step per the Board's own conception of it.

Consider the Board's reliance on the Symphony musicians' presumed access to social and traditional media. It is self-evident that the Tobin Center did not—and was not required to—carry the burden of introducing that alternative means or demonstrating that it is in fact a reasonable alternative to communicating with the musicians' target audience directly where it physically gathered. That alternative was never mentioned by the Tobin Center at any point in the proceedings, much less did the Tobin Center present any proof of the alternative's viability or efficacy. And because the Tobin Center never surfaced that alternative, Local 23 of course had no occasion to respond to it with a competing assessment or contrary evidence. The first time the alternative was even aired as a possibility was when the Board invoked it in the decision. In that context, the Board plainly did not "place the burden on the property owner to show that the alternative means of communication is reasonable." 368 NLRB No. 46, at \*15, J.A. 18. To the contrary, the Board entirely relieved the Tobin Center of any burden whatsoever.

What about the remaining alternative means mentioned by the Board—that of the Symphony musicians' leafleting across the street from the Tobin Center? With that alternative, too, the Board did not place the burden on the Tobin Center, even though the coherence of its test is predicated on doing just that. To be sure, the record contained evidence bearing on that alternative because the Symphony musicians' leafleting across the street was part of the factual background of the case. The

ALJ thus recounted that the Tobin Center had required the musicians "to distribute their leaflets off the Tobin Center property, such as the sidewalks across the street from the main entrance," and "[a]t these locations the leafleters were able to distribute a number of handbills, possibly several hundred." *Bexar*, 368 NLRB No. 46, at \*18, J.A. 31 (ALJ decision).

But even if the record contained evidence on which the Tobin Center could have relied had it been required to prove that leafleting across the street was a reasonable alternative means of communication, the Board did not impose any such burden on the Tobin Center. Instead, the Board simply deemed the requisite showing to have been made without requiring the Tobin Center to carry its burden to make it. After all, a party generally cannot be found to have carried its burden on an issue unless and until the opposing party has an opportunity to show why the burden is unmet. *See* Fed. R. Civ. P. 50(a)(1) (court can resolve an issue against a party as a matter of law only if the "party has been fully heard on [the] issue"). And here, Local 23 had no opportunity to make an argument or develop the record as to whether the Tobin Center could prove that the distribution of leaflets across the street genuinely amounted to a reasonable alternative means.

For instance, the ALJ, after describing that the Symphony's musicians had been required to distribute their leaflets across the street, observed that, "[o]f course, the leafleting may have been even more effective had the leafleters been able to distribute the handbills closer to the entrance of the Tobin Center, where the density of patrons would have likely been greater than across the street." *Bexar*, 368 NLRB No. 46, at \*18 n.2, J.A. 31. The Board did not enable Local 23 to develop arguments or evidence on the reasonableness of the alternative, which would have been part and parcel of placing the burden on the Tobin Center. Those arguments might have

addressed matters such as the distance from the public sidewalks to the theater entrances and the proportion of theater patrons who used the sidewalks, which could be thought to bear on whether leafletting from the public sidewalks qualifies as a reasonable alternative means.

None of this is to suggest that, had the burden in fact been allocated to the Tobin Center, the Tobin Center would have been unable to establish the reasonableness of the alternative of distributing leaflets across the street. The Tobin Center might well have done so. The point, rather, is that the Tobin Center did not in fact face that burden, and Local 23 did not in fact have any associated opportunity to show that the Tobin Center's burden was unmet. And when the Board fails to impose a burden that it views to be critical to the coherence of its own test, we have no choice but to reject the Board's application of its test as arbitrary.

On remand, the Board may decide whether to proceed with a version of the test it announced and sought to apply in this case or to develop a new test altogether. In either case, the Board's implementation of its approach presumably would be subject to judicial review.

\* \* \* \* \*

For the foregoing reasons, we grant Local 23's petition for review and remand to the Board for further proceedings consistent with this opinion.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: I join the court's opinion because I believe the National Labor Relations Board (Board) misapplied its new framework for contractor employees' access rights to this dispute. I write separately to emphasize my view that the Board's new framework is neither arbitrary nor capricious *per se*. The Board may overrule its precedent "as long as it provides a reasoned explanation for its change of course." *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 750 (D.C. Cir. 2017) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). We do not necessarily require a more detailed explanation when an agency changes course, however, as "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *Fox Television Stations*, 556 U.S. at 515. Here, had the Board adequately explained and applied the "exclusivity" and "alternative means" prongs of its new framework, I believe we would have been obliged to affirm its decision.